## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SOUTHWEST ENVIRONMENTAL CENTER
AND BORDER NETWORK FOR HUMAN
RIGHTS,

                         Plaintiffs,

vs.                                                    Civ. No.  2:18-cv-000632 WJ-KRS

JEFFERSON BEAUREGARD SESSIONS
III, in his official capacity as Attorney
General of the United States; KRISTJEN
NIELSEN, in her official capacity as
Secretary of the U.S. Department of
Homeland Security; JAMES N. MATTIS, in
his official capacity as Secretary of the U.S.
Department of Defense; and ALEX M.
AZAR II, in his official capacity as Secretary
of the U.S. Department of Health and Human
Services,

                         Defendants.

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

        This case is an attempted challenge under the Administrative Procedure Act

("APA") to the U.S. Department of Justice's ("DOJ") enforcement authority to prioritize

and prosecute illegal entry offenses and the U.S. Department of Homeland Security's

("DHS") corresponding temporary detention policy for migrant families entering this

country illegally pending family members' criminal or immigration proceedings.  Am.

Compl. ¶¶ 15, 34-50; *see* U.S. DOJ*, Memorandum on Zero-Tolerance for Offenses*

*Under 8 U.S.C. § 1325(a)* (April 6, 2018) (hereinafter "Zero-Tolerance Memo"),

https://www.justice.gov/opa/press-release/file/1049751/download; Office of the Pres.*,*

*Executive Order Affording Congress an Opportunity to Address Family Separation*

(June 20, 2018) (hereinafter "Temporary Family Detention E.O."), 2018 WL 3046068,

https://www.whitehouse.gov/presidential-actions/affording-congress-opportunity-address-family-separation.  Plaintiffs, two organizations, urge the Court to invalidate the executive branch's exercise of prosecutorial discretion, and enjoin federal prosecutors from enforcing the criminal law and DHS from enforcing the immigration law.  *Id.* at ¶¶ 34-50 and pp. 14-15.  There is no basis to do so.

This case is not justiciable.  Plaintiffs cannot proceed due to their lack of standing and a cause of action.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Moreover, the zero-tolerance policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999).  This policy does not offer substantive interpretation of the Immigration and Nationality Act ("INA"); it merely reflects DOJ's discretionary judgment about its enforcement priorities and how best to allocate its resources among competing priorities.  Courts have long held that such enforcement decisions are not subject to judicial review.  *See, e.g,. Wayte v. United States*, 470 U.S. 598, 607 (1985); *Chaney*, 470 U.S. 833.  Similarly, DHS's discretionary decisions as to whether and where to detain migrant families who have unlawfully entered are immigration actions that are shielded from review by statute.  *See Kucana v. Holder*, 558 U.S. 233, 248 (2010).  The Court should not permit Plaintiffs to circumvent these bedrock limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law.  The APA exempts "general statements of policy" from notice and comment and publication in the Federal Register, 5 U.S.C. § 553(b), and the zero-tolerance and family detention policies are a

reordering of enforcement priorities that readily qualify.  In sum, even if Plaintiffs'
challenges were somehow justiciable, the assumption underlying them would compel
dismissal.  The Court should dismiss the case.  Pursuant to Local Rule 7.1 opposing
counsel was contacted on August 2, 2018 via telephone to determine if they opposed
the filing of this motion.  Plaintiffs oppose the filing of this motion.

## BACKGROUND

### I.    Immigration Detention Under 8 U.S.C. § 1225(b)

A significant number of aliens who unlawfully enter the United States without any
documentation allowing for their admission are subject to a process commonly referred
to as "expedited removal," codified at 8 U.S.C. § 1225(b), which provides an
accelerated removal process for certain aliens.  69 Fed. Reg. 48,877 (Aug. 11, 2004).
Congress has explicitly mandated the detention of individuals who are in the expedited
removal process and have not been found to have a credible fear of persecution.  *See* 8
U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause
shall be detained pending a final determination of credible fear of persecution and, if
found not to have such a fear, until removed.").

Individuals subject to mandatory detention under expedited removal are eligible
for release from immigration detention only if they are granted parole under the limited
criteria in 8 U.S.C. § 1182(d)(5)(A) (DHS may, in its "discretion parole into the United
States temporarily under such conditions as [the Secretary] may prescribe only on a
case-by-case basis for urgent humanitarian reasons or significant public benefit any
alien applying for admission to the United States . . . .").  *See also* 8 C.F.R. §§
235.3(b)(2)(iii) and 235.3(b)(4)(ii) (parole of aliens who are awaiting a credible fear

determination or who have not expressed a fear of return "may be permitted only when the [Secretary of Homeland Security] determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective."). Thus, an alien who is subject to expedited removal, and who is seeking to establish that he or she has credible fear, is not subject to discretionary detention under 8 U.S.C. § 1226(a) and is ineligible for release on bond or a bond redetermination hearing before an immigration judge. 8 C.F.R. §§ 235.3(c), 1003.19(h)(2)(i)(B).

If a U.S. Citizenship and Immigration Services ("USCIS") asylum officer interviews an individual in expedited removal proceedings and determines that he or she has a credible fear of persecution or torture, the individual may seek asylum or other protection from removal before an immigration judge. 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. §§ 208.30, 235.3(b)(4). If the asylum officer determines the individual does not have a credible fear of persecution or torture, the individual may request review of that determination by an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42(d). If the immigration judge determines that the individual does not have a credible fear of persecution or torture, he or she may be removed from the United States. 8 U.S.C. § 1225(b)(1)(B)(iii); *see also* 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii); 8 C.F.R. § 1003.42(f) ("No appeal shall lie from a review of an adverse credible fear determination made by an immigration judge.").

If either the asylum officer or the immigration judge determines that the alien has a credible fear of persecution or torture, expedited removal proceedings are vacated and the alien is referred for removal proceedings before an immigration judge under 8

U.S.C. § 1229a.  *See* 8 C.F.R. § 208.30(f).  However, even after an individual is found to have a credible fear, release from detention is still limited to carefully prescribed circumstances.  Depending on the circumstances of the aliens' arrest, the alien may either be eligible for parole, if the Department concludes it is necessary for "urgent humanitarian reason or significant public benefit," 8 U.S.C. § 1182(b)(5), *see also* 8 C.F.R. § 212.5(b) (identifying categories of aliens for whom parole may serve an urgent humanitarian reason or significant public benefit), or the individual may be eligible for bond, if the alien can show "that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding,"  8 C.F.R. § 236.1(c)(8); *Matter of X-K-*, 23 I. & N. Dec. 731 (2005).

## II.   Criminal Immigration Prosecution and Temporary Family Detention For Families Entering the Country Illegally, Generally

Individuals in DHS custody are subject to immigration proceedings under the INA, and also may be subject to criminal prosecution, either for criminal immigration violations or for other criminal violations.  Notably, many of the immigration statutes that DHS enforces have criminal provisions, including but not limited to 8 U.S.C. §§ 1324 (alien smuggling), 1325 (unlawful entry), and 1326 (unlawful entry after removal), giving DHS discretion to refer individuals to DOJ for prosecution based on the particularized facts and circumstances of each case.

An increase in unauthorized individuals illegally crossing the Southwest border prompted DOJ on April 6, 2018 to issue a "Memorandum for Federal Prosecutors along the Southwest Border" that provides guidance to those prosecutors on how to exercise their prosecutorial discretion with respect to illegal entry enforcement consistent with

DOJ priorities.[1]  *See* Zero-Tolerance Memo; U.S. DOJ*, News Release: Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (April 6, 2018), 2018 WL 1666622.  The Zero-Tolerance Memo directs Southwest border prosecutors to accept for prosecution, to the extent practicable, all § 1325(a) offenses referred by DHS for prosecution.  Whether a person is prosecuted for such crime after a referral by DHS is a decision made by DOJ, and is subject to DOJ's prosecutorial discretion.  *See United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.").

At the inception of DOJ's zero-tolerance policy, DHS referred for prosecution adults (including adults who were traveling with children) it had cause to believe unlawfully entered this country on the Southwest border.  These adults were transferred to U.S. Marshals Service pretrial custody, while any children would remain in DHS immigration custody or would be classified as an unaccompanied alien child and transferred to the custody of the Department of Health and Human Services Office of Refugee Resettlement.  Upon completion of the adult's criminal proceedings, DHS was unable to swiftly reunite some adults with their children.  On June 20, 2018, the President signed an Executive Order to address the situation and require preservation of the family unit by keeping migrant families together during criminal and immigration

---

[1] DOJ one year earlier issued guidance to all federal prosecutors regarding a renewed commitment to criminal immigration enforcement.  *See* U.S. DOJ, *Memorandum on Renewed Commitment to Criminal Immigration Enforcement* (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.  That memorandum directed that federal law enforcement resources should be focused on prioritizing the prosecution of six criminal immigration related offenses, including illegal entry under 8 U.S.C. § 1325.

proceedings to the extent permitted by law, while also maintaining rigorous enforcement of immigration laws.  *See* Temporary Family Detention E.O.  This E.O. halted family separation generally and created the "Temporary Detention Policy for Families Entering This Country Illegally."  *Id.*  It directed DHS to "maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members."  *Id.*  In addition, it called for the Secretary of Defense "to take all legally available measures to provide to DHS any existing facilities available for the housing and care of alien families, and construct such facilities if necessary and consistent with law."  *Id.*

## III.    Plaintiffs' Complaint

Plaintiffs are the Southwest Environmental Center ("SWEC"), a conservation group dedicated to the protection and restoration of native wildlife and their habitats in the Southwest, and the Border Network for Human Rights ("BNHR"), an advocacy group that promotes human rights in southern New Mexico and Texas.  Am. Compl. ¶¶ 18, 22.  They contend that the zero-tolerance policy and the temporary immigration detention policies for migrant families must be set aside under the APA.  *Id.* at  ¶ 15.  First, they claim that the zero-tolerance policy violates the APA because it is a substantive rule issued without notice and comment.  *Id.* at ¶¶ 35-38.  Second, they claim that the family detention policy violates the APA because it is a substantive rule issued without notice and comment.  *Id.* at ¶¶ 41-45.  Third, they claim that the family detention policy violates the Freedom of Information Act ("FOIA") because it was not published in the Federal Register.  *Id.* at ¶¶ 48-50.  Plaintiffs seek injunctive and declaratory relief.  *Id.* at pp. 14-15.

## STANDARD OF REVIEW

Defendants move to dismiss the claims asserted against them for lack of subject matter jurisdiction and failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(1), (b)(6).  Plaintiffs bear the burden to show subject matter jurisdiction, and the Court must determine whether jurisdiction exists before addressing the merits.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 104 (1998).

## ARGUMENT

**I.     THIS CASE IS NOT JUSTICIABLE**

**A.     Plaintiffs Claims Are Not Cognizable**

**1.     Plaintiffs Lack Article III Standing**

Plaintiffs' claims should also be dismissed because Plaintiffs lack Article III standing to assert them.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  Plaintiffs have failed to allege that the Government's zero-tolerance prosecution of unlawful entrants or temporary detention of migrant families amounts to a cognizable injury suffered by them.  Instead, the complaint alleges that Southwest Environmental Center ("SWEC") members and staff, "regularly use the myriad federal, state, and local protected lands along the U.S. Mexico border in New Mexico and Texas for hiking, camping, viewing and studying wildlife, photography, hunting, horseback riding, and other scientific, vocational, and recreational activities."  Am. Compl. §§ 19, 20.  Border Network for Human Rights ("BNHR") "is an advocacy group that organizes marginalized border communities in the region around El Paso, Texas and Las Cruces, New Mexico to facilitate community education, organizing, and participation to defend and promote human and civil rights in the border region.  BNHR's work is strictly non-partisan; it

never supports or opposes candidates for elected office but instead focus on values, policy and practice.  Am. Compl. § 22.  None of the allegations advanced in the complaint rise to the level to show standing on the part of either Plaintiff.

"[T]he irreducible constitutional minimum of standing" requires that a plaintiff (1) have suffered an injury in fact, (2) that is caused by the defendant's conduct, and (3) that is likely to be redressed by a favorable ruling.  *Lujan*, 504 U.S. at 560.  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* at 560 (quotations omitted).  Allegations of possible future injury do not suffice; rather, "[a] threatened injury must be certainly impending to constitute injury in fact."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (quotation omitted).  Thus, a plaintiff must allege, "that he has been perceptibly harmed by the challenged action; not that he can imagine circumstances in which he could be affected by agency action."  *United States v. SCRAP*, 412 U.S. 669, 688-89 (1973); *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992).

The requirement of a causal connection between the defendant's conduct and the plaintiff's injury means that the injury must be "fairly traceable to the challenged action of the defendant," and not the result of the independent actions of a third party. *Lujan*, 504 U.S. at 560 (citation omitted).  For an injury to be redressable, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 561 (citation omitted).  These latter two elements make standing difficult to establish where a plaintiff challenges a law or action that does not regulate him.  As the Supreme Court has explained, "[w]hen … a plaintiff's asserted injury arises

from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed.  In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Id.* at 562.

Here, Plaintiffs have not satisfied the requirements for standing.  Plaintiffs, community organizations, vaguely claim that their members have been "directly harmed" by the zero-tolerance and family detention policies.  Am. Compl. ¶¶ 1-2, 4.  But they do not assert a legally cognizable direct injury.  The zero-tolerance policy is directed to federal law enforcement personnel, not Plaintiffs, and it is intended as a guide to the exercise of prosecutorial discretion.  *See* Zero-Tolerance Memo.  It does not "create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party" and does not alter in any way DOJ's authority to enforce federal laws relating to immigration.  *Id.*  Similarly, the temporary detention policy for families entering this county illegally is directed to federal law enforcement personnel, not Plaintiffs, and it is intended as a guide to maintain "family unity" while enforcing the criminal provisions of the INA.  *See* Temporary Family Detention E.O. at 1-2.

Instead of alleging an actual, concrete direct injury, Plaintiffs simply state they will suffer "irreparable harm" as a result of the possible "construct[ion] and operat[ion] [of] dozens of new detention facilities in th[e] [Southwest] region" to effect the family detention policy.  Am. Compl. ¶¶ 2, 4.  However, Plaintiff organizations do not identify any injury.  They seem to claim that their members live and recreate near the borderlands, and any possible construction of facilities to house migrants on federal

property, such as Fort Bliss, somehow rises to the level of an Article III injury to them. *Id.* at ¶¶ 4, 10, 18-20, 22-23.  However, the alleged injury is too vague and speculative to support standing.  Plaintiffs' complaint on this issue does not recount what has happened, but rather, sparsely states what they believe will happen in the future.  Such conjecture does not establish an injury in fact.  *See Whitmore*, 495 U.S. at 158; *Palmer v. City of Chicago*, 755 F.2d 560, 571 (7th Cir. 1985) ("[A] plaintiff's standing must be premised upon more than hypothetical speculation and conjecture that harm will occur in the future.").

Moreover, Plaintiffs cannot be injured by the Government's actions to a third party either in the criminal prosecution context or environmental context.  *See, e.g.*, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (holding that a private citizen does not have "a judicially cognizable interest in the prosecution" of another); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 803 (D.C. Cir. 1987) (holding that organizations failed to establish standing because they could not show that they suffered "direct harm," and instead were only "adventitiously affected" by the challenged action, and they could not show causation).  Because Plaintiffs lacks standing, the Court should dismiss their claims.

### 2.    Plaintiffs Are Not Within the Zone of Interest.

Even if Plaintiffs could establish Article III standing, they would lack a cause of action because they are not within the zone of interest of any statue.  The APA does not "allow suit by every person suffering an injury in fact."  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987).  Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant

statute." 5 U.S.C. § 702.  To be "aggrieved in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke*, 479 U.S. at 395.  Here, no provision of the INA even arguably protects community organizations from bearing any incidental effects of a § 1325 prosecution or migrant detention.  *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone of interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

**B.    The Enforcement Guidance Contained In The Zero-Tolerance Memo Is Committed To Agency Discretion And Thus Unreviewable**

Plaintiffs' challenge to the zero-tolerance policy also should be dismissed for another, independent reason: the policy is an unreviewable exercise of prosecutorial discretion.  The Zero-Tolerance Memo does not offer a substantive interpretation of the INA; it merely provides guidance to federal prosecutors in Southwest border jurisdictions on how to exercise their prosecutorial discretion consistent with DOJ's enforcement priorities.  Such enforcement guidance is not subject to judicial review.

The APA excludes judicial review of any action or decision "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  The Supreme Court has made clear that "[t]he Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996).  As such, a prosecutor's decision whether or not to prosecute, and what charge to file or bring, generally rests entirely in his discretion and is presumptively unreviewable. *See Wayte*, 470 U.S. at 607; *Nichols v. Reno*, 124 F.3d 1376, 1377 (10th Cir. 1997); *United States v. Robertson*, 45 F.3d 1423, 1437–38 (10th Cir. 1995); *United States v. Zabawa*,

39 F.3d 279, 284 (10th Cir. 1994); *see also Chaney*, 470 U.S. at 831; *In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997) ("In the ordinary case, the exercise of prosecutorial discretion, at the very core of the executive function, has long been held presumptively unreviewable.").

"This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id*.

Similarly, an administrative agency's decision whether to prosecute or enforce, whether through civil or criminal process, is generally committed to the agency's absolute discretion and is presumptively unreviewable. *Chaney*, 470 U.S. at 831, 833. The reason, again, is that agency enforcement decisions "involve[d] a complicated balancing of … factors which are peculiarly within [the agency's] expertise." *Id*. at 831. "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id*. at 831-32.

The Zero-Tolerance Memo is a quintessential exercise of enforcement discretion. It outlines DOJ's enforcement priorities and provides guidance to prosecutors and federal law enforcement on how federal resources should be used with respect to immigration enforcement in light of these priorities. It does not set forth DOJ's substantive interpretation of the INA; instead it is intended solely as a guide to the exercise of prosecutorial discretion. The zero-tolerance policy, therefore, is

presumptively unreviewable.  *See id.*; *see, e.g., Sec'y of Labor v. Twentymile Coal. Co.*, 456 F.3d 151, 161 (D.C. Cir. 2006) (holding that Secretary's decision to cite mine owner for safety violations was unreviewable where Mine Act gave Secretary "charging discretion . . . as uncabined as that of a United States Attorney under the Criminal Code").  Although the presumption of unreviewability of enforcement decisions may be rebutted where a decision is deliberately based on race, religion, or some other arbitrary classification, *see Wayte*, 470 U.S. at 608, that circumstance does not exist here.

Because the zero-tolerance policy is an exercise of enforcement discretion that is not subject to judicial review, Plaintiffs' zero-tolerance challenge should be dismissed for lack of jurisdiction.

**C.    DHS's Temporary Detention Policy for Families Entering The Country Illegally Is an Enforcement Matter Committed To Agency Discretion and Thus Unreviewable**

Plaintiffs' challenge to the family detention policy also should be dismissed for another, independent reason:  DHS's decisions as to whether and where to detain migrant families who have unlawfully entered are committed to agency discretion and shielded from judicial review.

The APA excludes judicial review of any action or decision "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).   Further, the Supreme Court has clarified that a decision unambiguously "specified by statute 'to be in the discretion of the [Government]'"—as in 8 U.S.C. § 1182(d)(5)(A)—is "shielded from court oversight by § 1252(a)(2)(B)(ii)." *Kucana*, 558 U.S. at 248.  Post-Illegal Immigration Reform and Immigrant Responsibility Act cases have recognized the non-reviewability of parole determinations in light of § 1252(a)(2)(B)(ii).   *Milardo v. Kerilikowske*, No. 3:16-MC-99,

2016 WL 1305120, *6, 9 (D. Conn. Apr. 1, 2016) (DHS's discretionary parole decisions are "generally not subject to judicial review, and [are] never subject to judicial review by a district court"); *United States v. Bush*, No. CR 12-92, 2015 WL 7444640, *1 (W.D. Pa. Nov. 23, 2015) (finding that 1252(a)(2)(B)(ii) "explicitly denies courts the jurisdiction to review" parole decisions, "except insofar as those claims raise constitutional issues, then only the appropriate court of appeals shall hear the case"); *Naul v. Gonzales*, No. 05-4627, 2007 WL 1217987, *2-*3 (D.N.J. Apr. 23, 2007) (parole denial pursuant to § 1182(d)(5)(A) "is a discretionary decision outside this Court's review").

Not only does section 1252(a)(2)(B)(ii) apply to DHS's discretionary grant or denial of parole, but it also extends to the procedures DHS employs in exercising that discretion.  *See, e.g., Giammarco v. Kerlikowske*, 665 Fed. App'x 24, 25-26 (2d Cir. 2016) (petitioner's indirect challenge to discretionary denial of parole was barred by § 1252(a)(2)(B)(ii)); *Loa-Herrera v. Trominski*, 231 F.3d 984, 990-91 (5th Cir. 2000) ("'the [Government's] discretionary judgment regarding the application of' parole—including the manner in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints—is 'not … subject to review,'" quoting 8 U.S.C. § 1226(e)); *Hatami v. Chertoff*, 467 F. Supp. 2d 637, 640-41 (E.D. Va. 2006) (challenge to the "manner and form" of alien's bond hearing was unreviewable under § 1252(a)(2)(B)(ii)).  Because DHS's decision declining to parole migrant families as a general matter is clearly committed to its discretion under the statute, that decision is not subject to review by

this Court. [2]

In addition, the Court lacks subject matter jurisdiction to review the discretionary determination of DHS under 8 U.S.C. § 1231(g)(1) as to the "appropriate places of detention for aliens detained pending removal or a decision on removal." *See* 8 U.S.C. § 1252(a)(2)(B)(ii). Specifically, that statute provides that no court has jurisdiction to review any decision or action the [Secretary of DHS] has discretion to make "under this subchapter" except for "the granting of relief under section 1158(a)." Among the actions referred to agency discretion are determinations on where to detain aliens in DHS custody. *See* 8 U.S.C. § 1231(g)(1) ("The [Secretary] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."); *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986) (holding that Executive "has the authority, conferred by statute, to choose the location for detention and to transfer aliens to that location"), as amended, 807 F.2d 769 (1987); *Rios-Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985) ("We are not saying that the petitioner should not have been transported to Florida. That is within the province of the Attorney General [now Secretary] to decide."); *Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995) ("The [former Immigration and Naturalization Service] necessarily has the

---

[2] It should be noted that DHS family residential centers are necessarily limited to the detention of verified family units. Thus, detention at a DHS family residential center may not be an available option for all adults who are encountered or apprehended by DHS along with a minor child, and who claim to be parent and child, but whose relationship cannot immediately be verified. Moreover, the Government's ability to hold family units in DHS family residential centers is subject to the limitations of the *Flores* Settlement Agreement, as interpreted more recently in a series of decisions by the U.S. District Court for the Central District of California and the Ninth Circuit. *See Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015); *Flores v. Lynch*, 212 F. Supp. 3d 907 (C.D. Cal. 2015); *Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016); *Flores v. Lynch*, 2017 WL 6049373 (C.D. Cal., Jan. 20, 2017). These court decisions place further restrictions on DHS's ability to detain family units together in all instances.

authority to determine the location of detention of an alien in deportation proceedings . . . and therefore, to transfer aliens from one detention center to another."); *Sasso v. Milhollan*, 735 F. Supp. 1045, 1046 (S.D. Fla. 1990) (holding that the Attorney General [now Secretary] has discretion over the location of detention); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (holding that "Attorney General's [now Secretary's] discretionary power to transfer aliens from one locale to another, as she deems appropriate, arises from" statute).

Thus, DHS's discretionary decision to detain migrant families in a particular facility is not judicially reviewable.  *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 691 (9th Cir. 2003) ("Under § 1252(a)(2)(B)(ii), . . . if the statute specifies that the decision is wholly discretionary, regulations or agency practice will not make the decision reviewable."); *see also Gandarillas-Zambrana*, 44 F.3d at 1256; *Wood v. United States*, 175 Fed. App'x 419, 420 (2d Cir. 2006) (holding that Executive "in the exercise of his statutory discretion in light of the available facilities, determined to hold Wood in an Arizona detention center. The Attorney General was not required to detain Wood in a particular state"); *Avramenkov v. INS*, 99 F. Supp. 2d 210, 213–15 (D. Conn. 2000) (holding that due to discretionary review bar of 8 U.S.C. § 1252(a)(2)(B)(ii) "the court lacks jurisdiction to prevent the INS from transferring the Petitioner to a federal detention facility in Oakdale, Louisiana.").[3]  Because  DHS's decision on whether and

---

[3] Although *Gandarillas-Zambrana* and *Committee of Central American Refugees* referred to the statutory authority for the Executive to decide on the location of immigration detention as arising from 8 U.S.C. § 1252(c), that statutory authority has been transferred to 8 U.S.C. § 1231(g)(1), the statute cited by *Wood. See Wood*, 175 F. App'x at 420; Pub. L. 104-208, Div. C, Title III, §§ 305(a)(3), 110 Stat. 3009 (1996); compare also 8 U.S.C. § 1252(c) (West 1994) with 8 U.S.C. § 1231(g)(1). This technical statutory modification has no bearing on the issues here, or the applicability of the above-cited authority to the instant claims.

where to detain migrants is an exercise of enforcement discretion that is not subject to judicial review, Plaintiffs' challenge to the family detention policy should be dismissed for lack of jurisdiction.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM

### A.   The Zero-Tolerance and Temporary Detention for Family Migrants Policies are Exempt From Notice and Comment

Plaintiffs miss the mark in arguing that the zero-tolerance policy and the temporary detention policy for family migrants who entered illegally must be set aside because they are substantive rules issued without notice and comment.  *See* Am. Compl. at ¶¶ 35-38.  These policies are classic examples of "general statements of policy" that are exempt from the APA's notice and comment requirements. 5 U.S.C. § 553(b).

A "substantive rule establishes a standard of conduct which has the force of law." *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).  Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power.*"  Chrysler Corp. v. Braun*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)).  It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule."  *Id.* at

252.  It serves to "appris[e] the regulated community of the agency's intentions" and "inform[d] the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).  And "a general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec.*, 506 F.2d at 38.  Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position . . . in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted).

As these principles make clear, the zero-tolerance and family detention policies are quintessential policy statements—a point that their texts reinforce again and again. *See* Zero-Tolerance Memo; Temporary Family Detention E.O.  They were issued as an exercise of executive branch's authority in establishing enforcement policies and priorities.  They explain how DOJ and DHS intend to exercise their enforcement authority, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831.

That is as it should be.  An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints.  *See Chaney*, 470 U.S. at 831. Indeed, these policies were originally adopted in part to set enforcement priorities in view of the increase in immigration related crime on the Southwest border and unlawful entries.  Under Plaintiffs' theory, however, even if immigration related crimes continued to increase, the agency's hands would be tied: it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory Utility*

*Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988). The Court should not endorse such an intrusion into matters that have "long been regarded as the exclusive province of the Executive Branch." *Chaney*, 470 U.S. at 832.

**B.    Plaintiffs' Alleged FOIA Claim Fails Because 5 U.S.C. § 552(a)(1) Does Not Provide A Private Right Of Action, And In Any Event, Publication Was Not Required**

Private rights of action to enforce alleged violations of federal statutes must be created by Congress. *See Alexander v. Sandoval*, 532 U.S. 275, 287 (2001) (citing *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979)) (the remedies available to challenge alleged violations of federal statutes are those "that Congress enacted into law"). Absent an express or implied statutory intent to create a private right to enforce the statute and an accompanying remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Alexander*, 532 U.S. at 286-87.

Here, Plaintiffs contend that Defendants have "violated" 5 U.S.C. § 552(a)(1) because the Government did not publish the family detention policy in the Federal Register. Am. Compl. ¶¶ 48-50. Plaintiffs however have not—because they cannot—shown that a private right of action exists to bring this claim. *See Suter v. Artist M.*, 503 U.S. 347, 363 (1992). In any event, this claim also fails for the same reasons as their notice and comment claim, and it can quickly be dispatched. The FOIA's requirement that an agency publish its substantive rules in the Federal Register applies only to substantive rules, not statements of policy. Because these procedures were not required here, *see* supra § II.A, the FOIA does not apply.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this matter.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

**/s/ Manuel Lucero 8/27/2018**
MANUEL LUCERO
Assistant U. S. Attorney
P. O. Box 607
Albuquerque, New Mexico  87103
(505) 224-1467
Manny.lucero@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2018, Defendant filed through the United States District Court CM/ECF System the foregoing document, causing it to be served by electronic means on all counsel of record.

**/s/ Manuel Lucero 8/27/2018**
MANUEL LUCERO
Assistant U. S. Attorney