# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

|  |  |
|---|---|
| SOUTHWEST ENVIRONMENTAL CENTER and BORDER NETWORK FOR HUMAN RIGHTS, | ) ) ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) |
| JEFFERSON BEAUREGARD SESSIONS III, in his official capacity as Attorney General of the United States; KIRSTJEN NIELSEN, in her official capacity as Secretary of the U.S. Department of Homeland Security; JAMES N. MATTIS, in his official capacity as Secretary of the U.S. Department of Defense; and ALEX M. AZAR II, in his official capacity as Secretary of the U.S. Department of Health and Human Services. | ) ) ) ) ) ) ) ) ) ) ) ) |
| *Defendants*. | ) ) |

**RESPONSE TO DEFENDANTS' MOTION TO DISMISS (DOC. 17)**

2:18-cv-00632-WJ-KRS

Oral Argument Requested

## TABLE OF CONTENTS

**INTRODUCTION**............................................................................................ **1**

**BACKGROUND** ............................................................................................ **2**

**STANDARD OF REVIEW** ............................................................................ **6**

**ARGUMENT** ................................................................................................ **7**

    A.   PLAINTIFFS HAVE STATED VIABLE NOTICE-AND-COMMENT CLAIMS UNDER 5 U.S.C. § 553 ........................................................................................ 7

        1.   *Plaintiffs Have Article III Standing* ................................................. 7

        2.   *Plaintiffs are Arguably within the Zone of Interest Protected by Section 553* . 10

        3.   *Defendants' Decision Not to Comply with Section 553 is Not Committed to Their Unreviewable Discretion*............................................................. 11

        4.   *Defendants' Policies are Substantive Rules Subject to Section 553* ................ 14

    B.   PLAINTIFFS HAVE STATED A VIABLE CLAIM FOR VIOLATION OF FOIA'S PUBLICATION REQUIREMENT ......................................................... 17

**CONCLUSION** ............................................................................ **19**

## INTRODUCTION

The Administrative Procedure Act ("APA") generally requires federal agencies to undertake notice-and-comment rulemaking before issuing enforcement policies that substantially cabin or eliminate agency discretion.  This requirement serves important policy goals by promoting reasoned decisionmaking and ensuring fair treatment for individuals and communities affected by the agency's decision.  In an era of increasing administrative authority over private individuals, it is no exaggeration to say that the APA has become as integral to our Nation's system of "ordered liberty" as the constitutional due process protections it helps effectuate.

This case arises from Defendants' attempt to overhaul national immigration policy without the benefit of the public input the APA requires.  Defendants recently adopted a policy of initiating misdemeanor criminal proceedings against *every* migrant detained along the U.S.-Mexico border, including many who have valid claims for asylum.  Around the same time, Defendants adopted a policy or practice of indefinitely detaining any migrant charged with a misdemeanor immigration offense until resolution of that charge.  These policies have resulted in a dramatic increase in the number of individuals detained in facilities across the Southwest.

As Judge Sabraw recently lamented, these policies have been implemented in a "reactive" way that "belie[s] measured and ordered governance."  *Ms. L. v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018).  Defendants were not prepared to deal with the consequences of their new policies.  In the first six weeks after the policies went into effect, more than 2,600 children were separated from their parents.  There was no system in place for tracking these children, or for reuniting them with their parents once the latter were released from detention.  *See id.* at 1143.  Defendants did not adequately explain their policy to those charged

1

with implementing it, which resulted in subordinates taking actions that were plainly illegal—like separating families who lawfully presented at ports of entry to petition for asylum. *See id.*

This chaos has been compounded by the fact that Defendants have kept the American people in the dark about the nature of their policies. Defendants frequently contradicted themselves in public statements about their policies, or denied that any new policy was in effect. Although Defendants have been required by court order to end their practice of separating families, their policies of prosecuting "100 percent of illegal Southwest Border crossings" and detaining all individuals charged with immigration offenses apparently remain in effect—although the public remains in the dark about the specifics of these policies.

It is time to restore measured and ordered governance. Defendants must not be permitted to flout bedrock principles of administrative law, which require them to *publish* their operative policies and, to the extent these policies create binding norms within the agency, to provide the public with notice and the opportunity to be heard. Defendants' various arguments for dismissing this case are unavailing. The motion should be denied.

## BACKGROUND

### A. Factual Background

On April 6, 2018, Attorney General Jeff Sessions issued a memorandum entitled "Zero-Tolerance for Offenses under 8 U.S.C. § 1325(a)." The memorandum directed each U.S. Attorney's Office along the U.S.-Mexico border "to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)."[1] In public statements, the Attorney

---

[1] Memorandum from Jeff Sessions to Federal Prosecutors, *Zero-Tolerance for Offenses under 8 U.S.C. § 1325(a)* (Apr. 6, 2018). The electronic version of this Response contains embedded hyperlinks, which can be accessed by clicking on text formatted *like this*.

General explained that this policy was designed to ensure that "100 percent of illegal Southwest Border crossings" would be criminally prosecuted.[2]

Following issuance of this memorandum, Defendants began referring every migrant detained along the U.S.-Mexico border—including many who were lawfully seeking asylum—for prosecution. Defendants also adopted a policy or practice of detaining these individuals indefinitely pending resolution of these charges. These policies resulted in more than 2,600 children being separated from their parents over the course of six weeks.[3]

The staggering increase in the number of children being held in federal custody soon overwhelmed the capacity of existing detention facilities. On June 14, 2018, a spokesperson for the U.S. Department of Health and Human Services confirmed that an encampment for children separated from their parents pursuant to Defendants' policies would be constructed at the Tornillo Land Port of Entry, near El Paso, Texas.[4] The spokesperson stated that the facility would "take in 360 children in the coming days and expand from there."[5]

On June 20, 2018, President Trump signed an Executive Order entitled "Affording Congress an Opportunity to Address Family Separation."[6] The Family Separation Order codified

---

[2] U.S. Dep't of Justice, _Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration_ (May 7, 2018).

[3] Philip Bump, _The Status of More than 2,600 Children at One Point Held by the Government_, WASH. POST (July 27, 2018).

[4] Claire Parker, _Trump Administration Makes Site Selection for Tent City Near El Paso To House Immigrant Children Separated from Parents_, TEX. TRIBUNE (Jun. 14, 2018).

[5] _Id._

[6] White House, _Affording Congress an Opportunity to Address Family Separation_ (Jun. 20, 2018).

Defendants' policy of detaining migrants indefinitely pending the resolution of misdemeanor charges, with the modification that, "to the extent permitted by law and subject to the availability of appropriations," families would now be detained together.  Order § 3(a) (providing that DHS "shall . . . maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members").  The Order also required the Secretary of Defense to provide the U.S. Department of Homeland Security ("DHS") with "any existing facilities available for the housing and care of alien families," and to "*construct* such facilities if necessary and consistent with law."  *Id.*, § 3(c) (emphasis added).

On June 26, 2018, Judge Dana M. Sabraw issued a preliminary injunction preventing Defendants from continuing to separate children from their parents, and requiring them to begin reuniting families they had previously broken apart.  *Ms. L.*, 310 F. Supp. 3d at 1149.  The court determined that plaintiffs were likely to prevail on their claim that Defendants' family separation policy was "so egregious, so outrageous, that may fairly be said to shock the contemporary conscience."  *Id.* at 1145 (citation and quotation marks omitted).  The process of family reunification is ongoing, and has been seriously complicated by the fact that Defendants deported hundreds of parents without their children.[7]

Although Judge Sabraw's order prevents the government from separating families going forward, it does not prevent Defendants from continuing to enforce the Zero Tolerance Policy, from detaining families together, or from constructing new detention facilities.  Defendants are moving forward with plans to construct a massive network of new detention facilities for the

_____

[7] Joshua Barajas, *More than 500 Migrant Children are Still Separated from their Parents*, PBS (Aug. 24, 2018).

purpose of implementing the Zero Tolerance Policy.  On June 21, 2018, the Associated Press obtained a memorandum indicating that the U.S. Department of Defense was preparing to construct facilities to house up to 20,000 migrant children on four military bases, including Fort Bliss, an army base located in El Paso County, Texas and Doña Ana County, New Mexico.[8]  On June 25, 2018, the El Paso Times reported that Fort Bliss had been selected as one of two sites to house these children.[9]  On June 27, 2018, it was reported that DOD was prepared to house up to 12,000 individuals at Fort Bliss.[10]

### B.  This Action

Plaintiffs are two community organizations that have longstanding interests in resisting the militarization of the border region and advocating on behalf of immigrant communities in southern New Mexico and far-west Texas.  On July 27, 2018, Plaintiffs filed their amended complaint and amended motion for preliminary injunction.  Docs. 10–11.  The amended complaint asserted three claims.  First, Plaintiffs assert that Defendants violated 5 U.S.C. § 553 by promulgating the Zero Tolerance Policy without offering the public notice and the opportunity to comment.  Doc. 10, ¶¶ 34–39.  Second, Plaintiffs assert that Defendants violated 5 U.S.C. § 553 by promulgating the Family Detention Policy without notice and comment.  *Id.*, ¶¶ 40–45.  Third, Plaintiffs assert that Defendants violated the Freedom of Information Act ("FOIA") by promulgating substantive rules,

---

[8] Robert Burns, *Pentagon Agrees to Provide Space For 20,000 Migrant Children*, AP NEWS (Jun. 21, 2018).

[9] Kyle Jones & Michelle Gaitan, *Fort Bliss, Goodfellow Military Bases In Texas Will House Immigrants, Pentagon Confirms*, EL PASO TIMES (Jun. 25, 2018).

[10] Tom Vanden Brook, *Fort Bliss In Texas May House 12,000 Migrants Detained At The Border*, USA TODAY (Jun. 27, 2018).

statements of general policy, and interpretations of general applicability in connection with these policies that were not published in the Federal Register. *Id.*, ¶¶ 46–50.

Plaintiffs submitted 28 pages of declarations in support of their amended motion for preliminary injunction. Doc. 11-1. These declarations describe in detail how Defendants' policies are harming Plaintiffs' members. Plaintiffs respectfully request that the Court deem these declarations to be incorporated by reference into the amended complaint.

On August 27, 2018, Defendants filed the instant motion to dismiss. Doc. 17. Although this was the court-ordered deadline for Defendants to respond to Plaintiffs' amended complaint *and* the amended motion for preliminary injunction (Doc. 15), Defendants did not respond to the motion. Plaintiffs have submitted a notice of completion with respect to the amended motion for preliminary injunction, requesting that it be treated as unopposed and granted in the event Defendants' motion to dismiss is denied. Doc. 18.

## **STANDARD OF REVIEW**

Defendants move to dismiss the amended complaint for want of subject matter jurisdiction and failure to state a claim. Because Defendants have mounted a "facial attack" on Plaintiffs' subject matter jurisdiction (i.e., they challenge the legal sufficiency, but not the veracity, of the relevant allegations), the same standard of review applies to both motions. *See Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). In other words, the court must "accept the well-pleaded allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Jones v. Hunt*, 410 F.3d 1221, 1223 (10th Cir. 2005) (citation omitted).

## ARGUMENT

### A.  Plaintiffs Have Stated Viable Notice-and-Comment Claims under 5 U.S.C. § 553

Plaintiffs' first and second claims for relief assert that Defendants violated the APA by adopting the Zero Tolerance and Family Detention Policies without observance of 5 U.S.C. § 553's notice-and-comment procedures.   Defendants move to dismiss these claims based on their contentions that (1) Plaintiffs lack Article III standing; (2) Plaintiffs "are not within the zone of interest of any statute;" (3) Defendants' decisions are "committed to agency discretion by law;" and (4) the Zero Tolerance and Family Detention Policies are "general statements of policy" that are exempt from section 553's notice-and-comment requirement.

#### 1.   Plaintiffs Have Article III Standing

In arguing that Plaintiffs lack Article III standing, Defendants ignore the principle that "procedural rights are special." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.7 (1992).  As Justice Scalia explained in *Lujan*, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Id.*  To establish standing to pursue a procedural claim, "a plaintiff need show only that compliance with the procedural requirements *could* have better protected its concrete interests . . . ." *New Mexico v. U.S. Dep't of Interior*, 854 F.3d 1207, 1215 (10th Cir. 2017) (emphasis in original; citation omitted).

Plaintiffs' members assert a number of concrete interests that have been adversely affected by the Zero Tolerance and Family Detention Policies, which *could* have been better protected if Defendants had allowed them to comment on the policies.  Border Network for Human Rights has members who have "experienced family separation . . . through the enforcement of U.S. immigration law."  Doc. 11-1 at 11, ¶ 6.  These individuals have a concrete interest in ensuring

that family members who were previously deported are not subject to unlawful restrictions if they subsequently return to the United States to seek asylum. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) (plaintiffs had standing to challenge policy that had the effect of "keeping them separated from certain relatives who seek to enter the country").

Plaintiffs also have concrete personal, reputational, and dignitary interests that are being harmed by Defendants' policies. Many of Plaintiffs' members are immigrants or the children of immigrants. Seeing migrant families detained in their own backyard causes these individuals to feel as though they have been stamped with a badge of inferiority, causing them to experience severe emotional distress. *See, e.g.*, Doc. 11-1 at 24, ¶ 13. Plaintiffs' members also have been directly impacted by unlawful and discriminatory immigration enforcement practices—which Defendants' policies and practices encourage, insofar as they demonize immigrants and create the perception that immigration officers are permitted to act with impunity. *See id.* at 10–12, ¶¶ 3–6. One member of Southwest Environmental Center is a U.S. Army veteran who benefits from the "current congenial relationship between Fort Bliss" and the surrounding community. *Id.* at 3, ¶ 3. If Fort Bliss were to house new detention facilities, it would "create distrust" in the community, harming veterans who would be stigmatized by the Army's association with Defendants' policy. *Id.* These interests are akin to those courts have previously found sufficient to support procedural standing. *See, e.g.*, *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 712–13 (6th Cir. 2015) (fans of the Insane Clown Posse musical group had standing to challenge the procedure by which the National Gang Intelligence Center listed them as a gang, based on their reputational interests and interest in not being "harassed, detained and otherwise mistreated by law enforcement officers").

Plaintiffs' members also include elected officials at the State, county, and local level. *See, e.g.*, Doc. 11-1 at 14–15. These individuals have a professional interest in helping to shape the

policies that will affect their constituents, and in learning exactly what those policies are.  These interests are sufficient to support procedural standing.  *Cf. New Mexico*, 854 F.3d at 1216 (New Mexico had concrete interest in "helping to shape . . . the terms under which the Pojoaque may conduct Class III gaming within its territory").

Finally, Plaintiffs have concrete aesthetic, recreational, and health interests that are being, or will imminently be, harmed by Defendants' policies.  Many of Plaintiffs' members live, work, and recreate near Fort Bliss, where new detention facilities are being constructed to house up to 12,000 children and families as required by Defendants' policies.  Plaintiffs' members will be harmed by the air pollution, noise pollution, traffic, garbage, land disturbance, and conversion of wildlife habitat that will result from the construction and operation of these facilities.  *See, e.g.*, Doc. 11-1 at 28–29, ¶¶ 4–6.  These injuries too support procedural standing.  *See New Mexico*, 854 F.3d at 1215 (courts "frequently f[ind] standing . . . in cases in which environmental groups have alleged that an agency failed to follow the required procedures in taking an action that negatively impacted members' concrete interest in protecting and enjoying the affected land.") (citing cases).

In arguing that Defendants lack standing, Defendants cite *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987).  This case actually *supports* Plaintiffs' standing.  The court in that case found that the plaintiff organization asserted a cognizable injury insofar as its "organizational purpose" of promoting the well-being of Haitian refugees had been thwarted by a policy designed to prevent Haitian refugees from entering the United States.  *Id.* at 799 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).  Plaintiffs' organizational purposes would certainly support a finding of concrete injury under that test.  The court went on to find that the plaintiff failed to establish causation and redressability, as would be necessary to support their *substantive*

challenges to the government's policy. *See id.* at 800–07. But, as explained, these elements are not applicable where a plaintiff asserts a *procedural* injury.

### 2. *Plaintiffs are Arguably within the Zone of Interest Protected by Section 553*

As Defendants note, only a person who is "adversely affected or aggrieved by agency action within the meaning of a relevant statute" may properly assert a cause of action under the APA. 5 U.S.C. § 702. "The relevant statute for purposes of a zone-of-interests inquiry is not the statute that is challenged by a plaintiff, nor is it the statute that provides the general context for the challenge to agency action, nor even necessarily the statute that authorizes the challenged agency action. It is the statutory (or other legal) provision that the plaintiff points to as the legal basis for arguing against the challenged agency action." *Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 674 (6th Cir. 2005). In this case, the statute that provides the legal basis for Plaintiffs' notice-and-comment claims is 5 U.S.C. § 553.

Section 553 provides that any "interested person[]" shall have the right to submit written data, views, or arguments before an agency promulgates a final rule. 5 U.S.C. § 553(c). Plaintiffs are interested persons within the meaning of this provision. Plaintiffs and their members have a variety of concrete interests that are being adversely affected by Defendants' policies. If given the opportunity to do so, Plaintiffs would share comments, views, and arguments related to these policies. Plaintiffs are "adversely affected or aggrieved" by Defendants' violation of section 553. *Accord California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 823 (N.D. Cal. 2017) ("Plaintiffs' right to be heard regarding the defendants' policy is plainly within the ambit of the APA."); *Texas v. United States*, 787 F.3d 733, 754 (5th Cir. 2015) (plaintiff had prudential standing to bring section 553 challenge to immigration policy based on its desire "to be heard in the formulation of" the policy); *see also Dismas Charities*, 401 F.3d at 677–79.

*FAIR, Inc. v. Reno*, 93 F.3d 897 (D.C. Cir. 1996), the only authority Defendants cite in support of their zone-of-interests argument, is distinguishable.  In *FAIR*, the plaintiff sought to enforce *substantive* provisions of federal immigration law, but was unable to point to any evidence that these provisions were intended to protect the interests it cited as the basis for its standing.  *See id.* at 901 (plaintiff could not point to any "language in the statutes on which it relies (8 U.S.C. §§ 1152, 1182, and 1254a and the Cuban Adjustment Act) . . . that even hints at a concern" for its interests).  Plaintiffs in this case are not seeking to enforce substantive provisions of immigration law.  Instead, they seek to enforce a statute that *explicitly* confers procedural rights on "any interested person."  Plaintiffs are arguably within the zone of interests of this provision.

### 3.  Defendants' Decision Not to Comply with Section 553 is Not Committed to Their Unreviewable Discretion

Defendants argue that Plaintiffs' APA claims must be dismissed because they ask the Court to review decisions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  This argument misses the mark.  The APA embodies "a basic presumption of judicial review." *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993) (citation and quotation marks omitted).  The "committed to agency discretion" provision is a "very narrow exception" to that presumption, which precludes review only in those "rare instances" where there is "no law to apply." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

When a plaintiff seeks to compel an agency to comply with the APA's notice-and-comment requirement, the "committed to agency discretion" exception has no application.  That is because section 553 provides clear legal principles for courts to apply in deciding whether an agency must undertake notice-and-comment rulemaking. *See Five Flags Pipe Line Co. v. U.S. Dep't of Transp.*, No. CIV. A. 89-0119 JGP, 1992 WL 78773, at *4 (D.D.C. Apr. 1, 1992) (rejecting agency's

argument that its "decision not to institute rulemaking procedures [wa]s unreviewable under section 701(a)(2)," reasoning that section 553 provides "ample law" to apply).

Defendants devote a considerable portion of their brief to arguing that the substantive policy decisions embodied in the Zero Tolerance and Family Detention Policies are committed to their unreviewable discretion. But even if that were true (and it is not),[11] the *procedural* question—whether Defendants were required to undertake notice-an-comment rulemaking before adopting these policies—certainly is not so committed. Courts have long recognized that a policy may be subject to enforceable procedural requirements even if it is substantively unreviewable. *See Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 243 (D.C. Cir. 2003) ("Although the court does not have jurisdiction to review the *substance* of the FAA's decision because it is 'committed to agency discretion by law,' the court does have jurisdiction to review Lopez's *procedural* claim that the FAA failed to follow its nonrenewal procedures.") (emphasis added, internal citation omitted).[12]

Defendants' extensive discussion of 8 U.S.C. § 1252(a)(2)(B)(ii) also misses the mark. This provision insulates from judicial review certain decisions made by the Attorney General or the Secretary of Homeland Security "the authority for which is specified under this subchapter to be in the discretion of" those officers. Nothing in the relevant subchapter specifies that Defendants

---

[11] *See, e.g.*, *Aracely, R. v. Nielsen*, No. CV 17-1976 (RC), 2018 WL 3243977, at *13 (D.D.C. July 3, 2018) (asylum seekers were likely to prevail on substantive challenge to interim detention policy); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) (same).

[12] *See also Lincoln*, 508 U.S. 182 (recognizing that an agency's compliance with the APA's notice-and-comment requirement is a question "quite apart from the matter of substantive reviewability," and proceeding to consider the legality of the agency's decision to forgo notice-and-comment *after* holding that the substance of the decision was unreviewable); *Shiffler v. Schlesinger*, 548 F.2d 96, 101 (3d Cir. 1977) (the fact that decision was substantively unreviewable did not "preclude judicial review of agency decisionmaking for compliance with the procedural requirements of [the National Environmental Policy Act]").

have discretion to adopt binding enforcement or detention policies without notice-and-comment. 8 U.S.C. § 1182(d)(5)(A) authorizes the Attorney General to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis . . . any alien applying for admission to the United States."   But the Attorney General's authority to review parole applications on a case-by-case basis cannot reasonably be read to authorize him to adopt a blanket policy that *eliminates* case-by-case review of these applications.  *Accord Aracely, R.*, 2018 WL 3243977, at *13 ("While § 1252(a)(2)(B)(ii) undoubtedly bars judicial review of individual parole decisions, courts have declined to apply it to claims challenging the legality of policies and processes governing discretionary decisions under the INA."); *Abdi v. Duke*, 280 F. Supp. 3d 373, 383–84 (W.D.N.Y. 2017) (although "discretionary decisions regarding parole under § 1182(d)(5)(A) are not reviewable by a court . . . Section 1252(a)(2)(B)(ii) does not bar th[e] claim" that the government unlawfully refused to follow its own policies in making parole decisions); *Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 309 (D.D.C. 2017) (because plaintiffs could not have challenged overarching policy in a particular adjustment-of-status proceeding, § 1252(a)(2)(B)(ii) did not bar them from pursuing that challenge in litigation).

Nor does 8 U.S.C. § 1226(e) preclude review.  This provision places beyond judicial review only discretionary decisions "regarding the detention or release of an[] alien" *in a particular case*. It does not apply where a plaintiff seeks to "challenge an overarching agency policy as unlawful," because "it is not within DHS's 'discretion' to decide whether it will be bound by the law."  *R.I.L-R*, 80 F. Supp. 3d at 176 (citation and quotation marks omitted); *cf. Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150, 155 (3d Cir. 2013) ("Nothing in 8 U.S.C. § 1226(e) prevents us from deciding whether the immigration officials had statutory authority to impose mandatory detention.").

#### 4.   Defendants' Policies are Substantive Rules Subject to Section 553

The APA establishes certain procedures that federal agencies must comply with before undertaking rulemaking—i.e., before adopting a "statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. §§ 551 (4), (5).  In general, federal agencies must provide members of the public with "[g]eneral notice" of proposed rulemaking.  *Id.*, § 553(b).  After notice is given, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ."  *Id.*, § 553(c).  An agency must respond to any significant comments it receives before finalizing the rule.  *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).

In deciding whether a policy is a substantive rule that must undergo notice and comment, the critical question is whether the policy "'genuinely leaves the agency and its decisionmakers free to exercise discretion.'"  *Texas v. United States*, 809 F.3d 134, 171 (2015) (quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002)).  "'An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding.'"  *Id.* (quoting *Gen. Elec.*, 290 F.3d at 383).  A policy need not set forth a new interpretation of law in order to be considered a substantive rule; a rigid policy for enforcing existing law may also qualify.  *See United States v. Kramer*, 757 F. Supp. 397, 436 (D.N.J. 1991) ("Simply put, agency actions which do not afford those individuals charged with carrying out agency responsibilities flexibility to handle agency matters on a case-by-case basis, may properly be viewed as substantive rules.") (collecting cases).

Courts have repeatedly applied these principles to invalidate immigration policies adopted without notice and comment.  An especially relevant precedent is *Jean v. Nelson*, 711 F.2d 1455 (11th Cir. 1983).  In May 1981, the Immigration and Naturalization Service ("INS") adopted a

14

new policy of indefinitely detaining Haitian migrants arriving in Florida until it could determine whether they were eligible for admission.  The district court held that this policy was invalid because it had been adopted without notice and comment, in violation of the APA.  The Eleventh Circuit affirmed.  The court explained that "an announcement that INS will universally enforce a detention policy while limiting parole is 'an agency statement of general applicability and future effect designed to implement, interpret, or prescribe law or policy,' in other words, a rule."  *Id.* at 1475 (citing 5 U.S.C. § 551(4); ellipses omitted).  Moreover, because the detention policy established a "binding norm" that was being rigidly enforced, it was a *legislative* rule that could not be adopted without notice and comment.  *Id. at* 1482–83.[13]

Other courts have invalidated immigration policies for failure to comply with the APA's notice-and-comment requirement.  In *Texas v. United States*, the Fifth Circuit upheld a preliminary injunction against the Deferred Action for Parents of Americans ("DAPA") program based on its finding that the policy did not "genuinely leave the [DHS] and its employees free to exercise discretion" in deciding whether to grant deferred action to certain undocumented immigrants.  809 F.3d at 170–176.  And in *U.S. ex rel. Parco v. Morris*, the court held that INS's "precipitous rescission" of a policy allowing deportable aliens to obtain voluntary extended departure was void for lack of notice and comment, where the policy left agency decisionmakers with "no discretion" in responding to these applications.  426 F. Supp. 976, 984 (E.D. Pa. 1977).

_____

[13] There were subsequent proceedings in *Jean*, including rehearing *en banc* and review by the Supreme Court.  Because the government responded to the panel decision by undertaking notice-and-comment rulemaking, however, this issue was mooted and the panel's decision was left undisturbed.  *See Jean v. Nelson*, 727 F.2d 957, 984 (11th Cir. 1984) (en banc) ("the government's promulgation of regulations under the notice and comment provisions of 5 U.S.C. § 553 to govern the new detention policy has mooted the issue of agency compliance with the APA").

Only weeks ago, a federal court denied DHS's motion to dismiss a notice-and-comment challenge to its alleged use of a "secret, alternate claims-processing system" in adjustment-of-status proceedings. *Jafarzadeh v. Nielsen*, No. CV 16-1385 (JDB), 2018 WL 3732130, at *2 (D.D.C. Aug. 6, 2018). The government argued that the system "merely provide[d] *guidance* to [agency] officials in exercising their discretionary power." *Id.* at *16. The court denied the government's motion, explaining that the plaintiffs had "plausibly allege[d] that the [policy] goes beyond mere guidance . . . [and] effectively mandates denials for aliens who meet specified criteria." *Id.* The court explained that if plaintiffs were able to establish that the policy does not "genuinely leave the agency and its decisionmakers free to exercise discretion," notice-and-comment procedure would be required. *Id.* (citation omitted).

Plaintiffs have a viable claim that Defendants violated the APA by adopting the Zero Tolerance and Family Detention Policies without notice-and-comment procedure. As in *Jean*, the government has committed to "universally enforce a detention policy." Defendants' Policy involves "referring 100 percent of illegal Southwest Border crossings" for prosecution, and detaining every migrant so referred. The stated purpose of this Policy is to *eliminate* the discretion of agency decisionmakers. On its face, it unquestionably creates a binding norm, with significant real-world consequences for migrants and border communities.

Defendants contend that the text of the Zero Tolerance and Family Detention Policies "reinforce again and again" that these documents are merely policy statements which leave the agencies with discretion "to change [their] position in any specific case." Doc. 17 at 19 (citation omitted). That is not accurate. Although both documents contain standard disclaimers indicating that they are not intended to create rights enforceable against the United States, nothing in either document indicates that agency decisionmakers are at liberty to depart from the policies on a case-

by-case basis.  Nor do Defendants explain how preservation of such discretion could be reconciled with a directive to undertake particular action in "100 percent" of cases.

In any case, even if the documents did purport to preserve discretion, notice and comment would still be required if, *in practice*, they were being applied in a way that eliminated discretion. *See Texas*, 787 F.3d at 764 (although DAPA "exude[d] discretion," notice and comment was likely required because plaintiffs' evidence showed it was binding in practice); *Aracely, R*, 2018 WL 3243977, at *27 ("The Court is not convinced that an agency can avoid challenges based on a policy that appears to be binding . . . simply by including a boilerplate disclaimer.").  Plainly, whether Defendants' policies are treated as binding in practice is a fact-intensive question that cannot be decided on a motion to dismiss. *Accord Jafarzadeh*, 2018 WL 3732130, at *2.  Plaintiffs have stated a claim for violation of 5 U.S.C. § 553.

## B.  Plaintiffs Have Stated a Viable Claim for Violation of FOIA's Publication Requirement

Plaintiffs' third claim for relief asserts that Defendants have violated 5 U.S.C. § 552(a)(1) by promulgating substantive rules, statements of general policy, and interpretations of general applicability that have not been published in the Federal Register or otherwise disclosed to the public.  Doc. 10, ¶¶ 46–50.  Defendants argue that this claim must be dismissed because (1) there is no statutory right of action to enforce the publication requirement of section 552(a)(1), and (2) section 552(a)(1)'s publication requirement applies only to substantive rules, not to general statements of policy.  Neither contention has merit.

Section 552(a)(4)(B) authorizes federal district courts "to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld . . . ."  5 U.S.C. § 552(a)(4)(B).  This provision "governs judicial review of . . . requests for

information under section[] 552(a)(1) . . . ." *Citizens for Responsibility & Ethics v. U.S. Dep't of Justice*, 846 F.3d 1235, 1240–41 (D.C. Cir. 2017) (citation an quotation marks).  In other words, FOIA creates a cause of action against a federal agency that fails to comply with section 552(a)(1)'s publication requirement.

Defendants' second contention—that section 552(a)(1)'s publication requirement only applies to "substantive rules, not statements of policy" (Doc. 17 at 20)—is also without merit.  The plain language of the statute confirms that "statements of general policy" are among the documents subject to FOIA's publication requirement.  5 U.S.C. § 552(a)(1)(D).  Thus, even policy statements that lack the force of law must be published if they are generally applicable and likely to have a significant impact on the public.  *See, e.g.*, *Preminger v. Sec'y of Veterans Affairs*, 632 F.3d 1345, 1349 (Fed. Cir. 2011) ("It is important to keep in mind that the Federal Register publication requirement of § 552(a)(1) applies both to legislative rules as well as certain non-legislative rules"); *Royer v. Fed. Bureau of Prisons*, 934 F. Supp. 2d 92, 97 (D.D.C. 2013) ("the APA requires that agencies *publish* interpretive rules and statements of policy in the Federal Register") (emphasis in original).

It is unclear whether Defendants' dispute Plaintiffs' standing with respect to the FOIA claim.  To the extent they do, the challenge fails.  It is well established that any person who is denied information to which he or she is entitled under federal law has standing to challenge that denial.  *See, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998).  Likewise, because FOIA's purpose is to promote transparency, any person who is wrongfully denied information falls within the statute's zone of interest.  *Cf. id.* at 20 (individuals complaining of their inability "to obtain relevant information" were within the zone of interests of election disclosure law).

## CONCLUSION

Plaintiffs respectfully requests that the Court deny Defendants' motion to dismiss (Doc. 17).  To the extent the Court concludes that additional factual allegations are needed with respect to any issue, Plaintiffs respectfully request leave to amend.

DATED: September 5, 2018                    Respectfully submitted,

                                            /s/ David Baake

                                            DAVID R. BAAKE
                                            New Mexico Bar # 150522
                                            275 Downtown Mall
                                            Las Cruces, NM 88001
                                            Telephone: (575) 343-2782
                                            david@baakelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2018, the foregoing Response was filed on the Court's CM/ECF system, which caused all counsel of record to receive service by electronic mail.

DATED: September 5, 2018                    /s/ David Baake