**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

SOUTHWEST ENVIRONMENTAL CENTER
AND BORDER NETWORK FOR HUMAN
RIGHTS,

                Plaintiffs,

vs.                          Civ. No.  2:18-cv-000632 WJ-KRS

JEFFERSON BEAUREGARD SESSIONS
III, in his official capacity as Attorney
General of the United States; KRISTJEN
NIELSEN, in her official capacity as
Secretary of the U.S. Department of
Homeland Security; JAMES N. MATTIS, in
his official capacity as Secretary of the U.S.
Department of Defense; and ALEX M.
AZAR II, in his official capacity as Secretary
of the U.S. Department of Health and Human
Services,

                Defendants.

**REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

       Plaintiffs' Response, (Doc. No. 19) to Defendants' Motion to Dismiss, (Doc. No 16) fails to explain

how Plaintiffs have standing to maintain the Amended Complaint or the Amended Motion for Preliminary

Injunction.  This case is an attempted challenge under the Administrative Procedure Act ("APA") to the

U.S. Department of Justice's ("DOJ") enforcement authority to prioritize and prosecute illegal entry

offenses and the U.S. Department of Homeland Security's ("DHS") corresponding temporary detention

policy for migrant families entering this country illegally pending family members' criminal or immigration

proceedings.  Am. Compl. ¶¶ 15, 34-50; *see* U.S. DOJ*, Memorandum on Zero-Tolerance for Offenses

Under 8 U.S.C. § 1325(a)* (April 6, 2018) (hereinafter "Zero-Tolerance Memo"),

https://www.justice.gov/opa/press-release/file/1049751/download; Office of the Pres.*, Executive Order

Affording Congress an Opportunity to Address Family Separation* (June 20, 2018) (hereinafter

"Temporary Family Detention E.O."), 2018 WL 3046068, https://www.whitehouse.gov/presidential-

actions/affording-congress-opportunity-address-family-separation.  Plaintiffs, two organizations, urge the

Court to invalidate the executive branch's exercise of prosecutorial discretion, and enjoin federal

prosecutors from enforcing the criminal law and DHS from enforcing the immigration law.  *Id.* at ¶¶ 34-50

and pp. 14-15.  There is no basis to do so.

Plaintiffs cannot proceed due to their lack of standing and a cause of action.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  As shown in the Defendants' Memorandum in Support of the Motion to Dismiss, (Doc. No. 17) the zero-tolerance policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999).  The policy objected to by the Plaintiffs is not a new rule.  The underlying rule has been in effect since the previous administration.  The directive from the Attorney General is a discretionary decision to begin enforcement.  Zero tolerance is not a new rule requiring APA review standards.  The Zero Tolerance policy issued by the Department of Justice  does not offer substantive interpretation of the Immigration and Nationality Act ("INA"); it merely reflects DOJ's discretionary judgment about its enforcement priorities and how best to allocate its resources among competing priorities.

**LACK OF STANDING**:

As shown by Defendants in its Memorandum, Plaintiffs lack Article III standing to maintain a cause of action either in the Amended Complaint or in the Motion for Preliminary Injunction.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  Plaintiffs have failed to allege or to show in their Response that the Government's zero-tolerance prosecution of unlawful entrants or temporary detention of migrant families amounts to a cognizable injury suffered by them.  Instead, the complaint alleges that Southwest Environmental Center ("SWEC") members and staff, "regularly use the myriad federal, state, and local protected lands along the U.S. Mexico border in New Mexico and Texas for hiking, camping, viewing and studying wildlife, photography, hunting, horseback riding, and other scientific, vocational, and recreational activities."  Am. Compl. §§ 19, 20 and Am. Motion for Preliminary Injunction Appendix 11-1.

The basic question in every federal case is whether the court had the judicial power to entertain the suit. *National Rifle Assoc. of A., v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citing <u>Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)</u>).  Article III of the United States Constitution prescribes that federal courts may exercise jurisdiction only where an actual "case or controversy" exists. See U.S. Const. art. III, § 2.  Courts have explained the "case or controversy" requirement through a

series of "justiciability doctrines," including, "perhaps the most important," that a litigant must have "standing" to invoke the jurisdiction of the federal courts. *Magaw*, 132 F.3d at 279.

The Supreme Court has enumerated the following elements necessary to establishing standing:

> First, Plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations and quotations omitted). The standing inquiry is particularly rigorous when reaching the merits of the dispute "would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Intern. USA*, ––– U.S. –––, 133 S.Ct. 1138, 1147, 185 L.Ed.2d 264 (2013) (*quoting Raines v. Byrd*, 521 U.S. 811, 819–20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)).

A plaintiff must have standing for each claim pursued in federal court. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006). However, only one plaintiff needs to have standing in order for the suit to move forward. *See Horne v. Flores*, 557 U.S. 433, 446–47, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009) ("[T]he critical question is whether at least one petitioner has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction."); *Massachusetts v. EPA*, 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007).

The injury prong of the standing doctrine requires that the harm be actual or imminent. In other words, the harm must have already occurred or it must be likely to occur "imminently." *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. 2130. "Imminent" in this context is defined as "certainly impending," in contradistinction to "allegations of possible future injury." *Clapper*, 133 S.Ct. at 1147. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. 2130 (*quoting Lujan v. National Wildlife Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Moreover, the injury must be to a legally cognizable right. *711 *McConnell v. FEC*, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (overruled on other grounds); *Citizens United v. FEC*, 558 U.S. 310, 130 S.Ct. 876, 175

L.Ed.2d 753 (2010); Diamond v. Charles, 476 U.S. 54, 64, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986).

The Plaintiffs' Response does not show anything new or illustrate how they have been harmed or how they will suffer a harm "imminently" and therefore, lack standing to bring this action.  The affidavits, complaint and motion for preliminary injunction submitted by the Plaintiffs are all based on speculative harm to their recreational enjoyment of the area located in southwest Texas and the Ft. Bliss area and not to how they will be directly damaged by the implementation of an immigration policy.  The argument that potential building of detention facilities will impede their use of the area is also speculative.  The Plaintiffs point to nothing that shows actual harm to any of their members specifically from the implementation of the zero tolerance immigration policy.  Instead, Plaintiffs argue that they have, "concrete personal, reputational, and dignitary interest that are being harmed by Defendants' policies.  Many of Plaintiffs' members are immigrants or the children of immigrants…. causing them to experience severe emotional distress."  (Doc No. 19 pg. 10).  This too is speculative and does not rise to granting them standing to bring this action.

Plaintiffs point to *Parson v. U.S. Dep't of Justice* 801 F.3f 701 (6th Cir. 2015) to show that they have shown enough to have the Court find "procedural standing".  To the extent Plaintiffs suggest they have a right to notice and comment rulemaking, which raises an alleged procedural injury, there is no procedural injury because the zero tolerance policy is prosecutorial discretion and not subject to APA review, let alone notice and comment.   Moreover, in *Parsons*, the named defendants did, in fact, show that they had suffered injury, in fact, having their First and Fifth Amendment rights violated because the Department of Justice had added them to a gang watch list.  In this matter, Plaintiffs fail to show injury in fact or imminent harm and only point to speculative or possible injury by the government's enforcement of a stricter policy concerning immigration.  "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).  Generally, standing is found based on First Amendment violations where the rule, policy or law in question has explicitly prohibited or proscribed conduct on the part of the plaintiff. *See, e.g., Nat'l Right to Life PAC v. Connor*, 323 F.3d 684 (8th Cir.2003) (Missouri election provisions required out-of-state committees to have an in-state treasurer and deposit account if annual spending exceeded $1500); *Clapper*, 133 S.Ct. at 1153 (noting that case law does not "hold[ ] or

4

even suggest[ ] that plaintiffs can establish standing simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part").  Here, the enforcement of a stricter immigration policy does not "regulate, constrain, or compel any action" on the part of the plaintiffs. *See Clapper*, 133 S.Ct. at 1153. The chilling effect alone, therefore, does not constitute an injury in fact. *See Morrison v. Bd. of Educ.*, 521 F.3d 602, 609–610 (6th Cir.2008) ("First Amendment chill typically constitutes the 'reason why the governmental imposition is invalid rather than the harm which entitles a party to challenge it.' ") (*quoting Adult Video Assoc. v. Dep't of Justice*, 71 F.3d 563, 566 (6th Cir.1995)).  Plaintiffs continue to argue that the zero tolerance policy is new rule making and have a right to notice and comment.  However, the process here is prosecutorial discretion and not subject to APA review, let alone notice and comment.

Here, Plaintiffs have not satisfied the requirements for standing.  Plaintiffs, community organizations, vaguely claim that their members have been "directly harmed" by the zero-tolerance and family detention policies.  Am. Compl. ¶¶ 1-2, 4.  But they do not assert a legally cognizable direct injury. The zero-tolerance policy is directed to federal law enforcement personnel, not Plaintiffs, and it is intended as a guide to the exercise of prosecutorial discretion.  *See* Zero-Tolerance Memo.  It does not "create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party" and does not alter in any way DOJ's authority to enforce federal laws relating to immigration.  *Id.*  Similarly, the temporary detention policy for families entering this county illegally is directed to federal law enforcement personnel, not Plaintiffs, and it is intended as a guide to maintain "family unity" while enforcing the criminal provisions of the INA.  *See* Temporary Family Detention E.O. at 1-2.

Instead of alleging an actual, concrete direct injury, Plaintiffs simply state they will suffer "irreparable harm" as a result of the possible "construct[ion] and operat[ion] [of] dozens of new detention facilities in th[e] [Southwest] region" to effect the family detention policy.  Am. Compl. ¶¶ 2, 4.  However, Plaintiff organizations do not identify any injury.  They seem to claim that their members live and recreate near the borderlands, and any possible construction of facilities to house migrants on federal property, such as Fort Bliss, somehow rises to the level of an Article III injury to them.  *Id.* at ¶¶ 4, 10, 18-20, 22-23. However, the alleged injury is too vague and speculative to support standing.  Plaintiffs' complaint on this issue does not recount what has happened, but rather, sparsely states what they believe will happen in

the future.  Such conjecture does not establish an injury in fact.  *See Whitmore*, 495 U.S. at 158; *Palmer v. City of Chicago*, 755 F.2d 560, 571 (7th Cir. 1985) ("[A] plaintiff's standing must be premised upon more than hypothetical speculation and conjecture that harm will occur in the future.").

Moreover, Plaintiffs cannot be injured by the Government's actions to a third party either in the criminal prosecution context or environmental context.  *See, e.g.*, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (holding that a private citizen does not have "a judicially cognizable interest in the prosecution" of another); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 803 (D.C. Cir. 1987) (holding that organizations failed to establish standing because they could not show that they suffered "direct harm," and instead were only "adventitiously affected" by the challenged action, and they could not show causation).  Because Plaintiffs lacks standing, the Court should dismiss their claims.

**THERE WAS NO VIOLATION OF THE APA**:

The APA does not "allow suit by every person suffering an injury in fact."  *Clarke v. Secs. Indus. Ass'n,* 479 U.S. 388, 395 (1987).  Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  To be "aggrieved in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question."  *Clarke*, 479 U.S. at 395.  In their Response, Plaintiffs allege that they are within the zone of interest and cite to *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 823 (N.D. Ca. 2017) and Texas v. United States, 787 F.3d 733, 754 (5th Cir. 2015) both for the proposition that they have a right to be heard when the government is rule making.  This would be correct if the government were engaged in implementing a new rule.  However, implementing a directive or a policy as to how to enforce the existing regulation dealing with immigration is not rule making.  Here, no provision of the INA even arguably protects community organizations from bearing any incidental effects of a § 1325 prosecution or migrant detention.  *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone of interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

The Enforcement Guidance Contained in the Zero-Tolerance memo is committed to agency discretion and therefore, unreviewable.  Plaintiffs' challenge to the zero-tolerance policy also should be

dismissed for another, independent reason: the policy is an unreviewable exercise of prosecutorial discretion.  The Zero-Tolerance Memo does not offer a substantive interpretation of the INA; it merely provides guidance to federal prosecutors in Southwest border jurisdictions on how to exercise their prosecutorial discretion consistent with DOJ's enforcement priorities.  Such enforcement guidance is not subject to judicial review.

Plaintiffs argue, "Defendants' Policies are substantive rules subject to Section 553 because the government is undertaking rule making."  This misses the mark.  The government is not rule making but taking another approach to immigration enforcement of an existing regulation.  The Administrative Procedure Act (APA) establishes the procedures federal administrative agencies use for "rule making," defined as the process of "formulating, amending, or repealing a rule." 5 U.S.C. § 551(5).  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1200 (2015).  The APA distinguishes between two types of rules: So-called "legislative rules" are issued through notice-and-comment rulemaking, see §§ 553(b), (c), and have the "force and effect of law," *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–303, 99 S.Ct. 1705 (1979) 60 L.Ed.2d 208 (1979). "Interpretive rules," by contrast, are "issued ... to advise the public of the agency's construction of the statutes and rules which it administers," *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (195), 115 S.Ct. 1232 (1995), 131 L.Ed.2d 106 (1995), do not require notice-and-comment rulemaking, and "do not have the force and effect of law," Perez at 1201.  The zero tolerance policy is neither of these.  Prosecutorial discretion which this is, requires no rule making procedures.  The policy is a directive of the Attorney General to the Offices of the US Attorney as to his desire on how to enforce the existing immigration law.  The government was not engaging in rule making which would clearly trigger a notice and comment time frame requiring open hearings in order to implement new rules.  The APA applies only if there is a reviewable final agency action.  Here there is no such reviewable action pursuant to the Court's decision in *Heckler* at 832 applying its reasoning under 701(a)(2) and therefore, no requirement for notice and comment is required here.  The APA expressly exempts from its rulemaking requirement "general statements of policy." 5 U.S.C. § 553(b)(3)(A).  Such exempt policy statements include "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil,* 508 U.S. 182, 197 (1993) (citation omitted).  An agency's articulation of non-binding guidelines for the exercise of its prosecutorial discretion

falls squarely within this exemption from rulemaking requirements.  *See Mada-Luna v. Fitzpatrick*, 813

F.2d 1006, 1013, 1017 (9th Cir. 1987) (INS guidelines for deferred enforcement action against

immigration violators merely "inform the public concerning the agency's future ... priorities for exercising

its discretionary power" and are thus general policy statements exempt from notice-and-comment

rulemaking); *Am. Hosp. Ass'n v. Bowen*, 834 F.3d 1037 (D.C. Cir. 1987).

 Even had Plaintiffs plead a cognizable final agency action, the APA bars judicial review of certain

categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'"

*Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (quoting 5 U.S.C. § 701(a)(2)).  These decisions are typically

unreviewable because there exists "no meaningful standard against which to judge the agency's exercise

of discretion" in these areas. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  In such circumstances, the

APA's waiver of sovereign immunity does not apply, and the Court lacks jurisdiction over any APA

challenge. *See E.J. Friedman Co. v. United States*, 6 F.3d 1355, 1359–60 (9th Cir. 1993) (where claim "is

not reviewable under the APA" pursuant to 8 U.S.C. § 701(a)(2), "the APA also does not serve as a

waiver of sovereign immunity" and "the district court [does] not have subject matter jurisdiction").  This bar

applies, moreover, even when "the agency gives a 'reviewable' reason for otherwise unreviewable

action." *ICC v. Bhd. of Locomotive Eng'rs (BLE),* 482 U.S. 270, 283 (1987).

 Among the decisions committed to executive discretion are "an agency's exercise of enforcement

power." *Chaney*, 470 U.S. at 831.  Such judgments involve "a complicated balancing of factors which are

peculiarly within [an agency's] expertise," including "whether agency resources are best spent on this

violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement

action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough

resources to undertake the action at all." *Id.* As there is "no meaningful standard against which to judge

the agency's exercise of discretion" in weighing these factors, an agency's exercise of enforcement

powers is "presumed immune from judicial review under § 701(a)(2)." *Id.* at 830, 832.  For instance, an

"agency decision not to prosecute or enforce, whether through civil or criminal process, is a decision

generally committed to an agency's absolute discretion." *Id.* at 831.  After all, "[a]n agency generally

cannot act against each technical violation of the statute it is charged with enforcing," and it "is far better

equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."

Id. at 831–32.

An agency's decision to enforce the law against a particular individual is likewise presumptively unreviewable. "[T]he decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," and "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute," "courts presume that they have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted). Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall priorities" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative decision makers"). And that is especially so in the context of immigration enforcement. On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97. Given these realities, the "broad discretion exercised by immigration officials" is a "principal feature of the" immigration system Id. at 396.

The decision to prosecute unlawful entrants for violating our laws is a paradigmatic example of agency action committed to agency discretion. See *Chaney*, 470 U.S. at 831. As the Supreme Court has made clear, Courts defer to a prosecutor's discretionary determination because "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). And that is true whether the decision to prosecute is made ad hoc or on a categorical basis, consistent with the Government's enforcement priorities. *See Morales de Soto v. Lynch,* 824 F.3d 822, 828 (9th Cir. 2016) (explaining that "the exercise of prosecutorial discretion is a type of government action uniquely shielded from and unsuited to judicial intervention" notwithstanding the

existence of DHS memoranda addressing how DHS should exercise its discretion).

Plaintiffs suggest that the decision to separate children from their parents while those parents are being prosecuted for the crime of illegal entry or reentry or serving their sentence for those crimes somehow changes the analysis. Complaint ¶¶ 361-66.  However, a prosecutor no more engages in a reviewable decision to prosecute when a criminal alien defendant cannot be housed with their child while proceedings are ongoing or when serving their sentence than when a United States citizen must serve their criminal sentence without their child.  *See Morales de Soto*, 824 F.3d at 828 ("We see no reason to act differently when the consequence of that discretion is removal rather than jail time").  In both instances, the parent lacks any entitlement, constitutional, statutory, or otherwise, to force the Government to detain them with their children while they serve their criminal sentence.  *See, e.g., Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (recognizing that rights of familial association apply differently when an individual is imprisoned); *Aguilar v. ICE*, 510 F.3d 1, 22 (1st Cir. 2007) (rejecting the notion of a due process right to family visitation in immigration detention).

That is especially the case in the immigration context where by statute the Government must take custody of alien minors whose parents are not "available to provide care and physical custody." 6 U.S.C. § 279(g)(2)(C)(ii); see 8 U.S.C. § 1232(c)(3)(A); *Reno v. Flores*, 507 U.S. 292 304-05 (1993) (holding that that an alien child with no available parent, guardian, or close relative was not constitutionally entitled to be released to the custody of an unrelated adult, rather than placed in a childcare institution selected or operated by the government).  By definition, an alien in criminal custody is not "available to provide care and physical custody" for their child. *See D.B. v. Cardall*, 826 F.3d 721, 734 (4th Cir. 2016) (emphasis added) ("to be 'available to provide care' for a child, a parent must be available to provide what is necessary for the child's health, welfare, maintenance").  Therefore, the alleged "policy" Plaintiffs identify is nothing more than a consequence of the Government's decision to prosecute aliens for the crime of illegal entry or re-entry.  Plaintiffs have not alleged any plausible basis for overcoming the presumption that the decision to prosecute an alien for unlawful entry or reentry or to house their child separate from them pending resolution of their criminal proceedings are not subject to review under the APA.

**FOIA HAS NOT BEEN VIOLATED**:

Plaintiffs contend that Defendants have "violated" 5 U.S.C. § 552(a)(1) because the

Government did not publish the family detention policy in the Federal Register.  Am. Compl. ¶¶ 48-50.

Plaintiffs however have not—because they cannot—shown that a private right of action exists to bring this

claim.  *See Suter v. Artist M.*, 503 U.S. 347, 363 (1992).  The FOIA's requirement that an agency publish

its substantive rules in the Federal Register applies only to substantive rules, not statements of policy.

Because these procedures were not required here, *see* supra § II.A, the FOIA does not apply.   Plaintiffs

do not allege that they have filed a FOIA request, which would trigger the requirements of the FOIA

statue.  They attempt to take out of context the declaratory paragraph of the FOIA, and attempt to

bootstrap their arguments under the APA to add weight to their argument and to create a cause of action.

As noted, the Plaintiffs do not have an outstanding FOIA request.  No documents have been withheld in

violation of the FOIA.

 Plaintiff cites to *Preminger v. Sec'y of Veterans Affairs*, 632 F3d 1345 (Fed. Cir. 2011) and *Royer

v. Fed. Bureau of Prisons,* 934 F. Supp 2d 92 (D.D.C. 2013) to support its argument that somehow the

FOIA has been violated and therefore, they have standing or some type of cause of action to bring this

action.  However, neither is on point.  They simply state the obvious, that once the government is

engaged in rule making the prospective rule must be published by the agency.  Here, as argued supra,

there is no rulemaking, and the FOIA is not applicable and does not create a separate cause of action.

The FOIA does not create a cause of action, unless and until the Plaintiffs file a FOIA request and the

agency fails to deliver documents to the requester.  Plaintiffs do not argue that they have an outstanding

FOIA request with any agency.  They do not argue that documents have not been turned over pursuant to

a FOIA request.  They only seem to argue that because their argument with respect to some sort of

rulemaking is valid, that an agency has not published the new rule.  This is not correct and FOIA does not

apply here.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this matter.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

**/s/ Manuel Lucero 9/13/2018**
MANUEL LUCERO
Assistant U. S. Attorney
P. O. Box 607
Albuquerque, New Mexico  87103
(505) 224-1467
Manny.lucero@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2018, Defendant filed through the United States District Court CM/ECF System the foregoing document, causing it to be served by electronic means on all counsel of record.

**/s/ Manuel Lucero 9/13/2018**
MANUEL LUCERO
Assistant U. S. Attorney