IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SOUTHWEST ENVIRONMENTAL CENTER
AND BORDER NETWORK FOR HUMAN
RIGHTS,

   Plaintiffs,

  vs.                Civ. No. 2:18-cv-000632 WJ-KRS

JEFFERSON BEAUREGARD SESSIONS
III, in his official capacity as Attorney
General of the United States; KRISTJEN
NIELSEN, in her official capacity as
Secretary of the U.S. Department of
Homeland Security; JAMES N. MATTIS, in
his official capacity as Secretary of the U.S.
Department of Defense; and ALEX M.
AZAR II, in his official capacity as Secretary
of the U.S. Department of Health and Human
Services,

   Defendants.

**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION TO DISMISS**

   THIS MATTER comes before the court upon Defendants' Motion to Dismiss, filed August 27, 2018 **(Doc. 16)**. This lawsuit is an attempted challenge under the Administrative Procedure Act ("APA") to the U.S. Department of Justice's ("DOJ") enforcement authority to prioritize and prosecute illegal entry offenses and the U.S. Department of Homeland Security's ("DHS") corresponding temporary detention policy for migrant families entering this country illegally pending family members' criminal or immigration proceedings. Am. Compl. ¶¶ 15, 34-50. Having

reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motion is well-taken and, therefore, is GRANTED.[1]

**BACKGROUND**

Plaintiffs' challenge focuses on these recent attempts by Defendants to overhaul national immigration policy:

- DOJ's Memorandum on Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a) (April 6, 2018) (hereinafter "Zero-Tolerance Memo" or "zero-tolerance policy").[2] *See* 2018 WL 1666622, U.S. DOJ, News Release ("Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry"); and

- Office of the Pres., Executive Order Affording Congress an Opportunity to Address Family Separation (June 20, 2018) (hereinafter "Temporary Family Detention E.O." or "temporary detention policy"), 2018 WL 3046068.

**I.     History of Relevant Immigration Policy**

A significant number of aliens who unlawfully enter the United States without any documentation allowing for their admission are subject to a process commonly referred to as "expedited removal," codified at 8 U.S.C. § 1225(b), which provides an accelerated removal process for certain aliens. 69 Fed. Reg. 48,877 (Aug. 11, 2004). Congress has explicitly mandated the detention of individuals who are in the expedited removal process and have not been found to have a credible fear of persecution. See 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.").

---

[1] Plaintiffs request oral argument, but the Court finds that oral argument would not assist the Court in ruling on the issues raised in the motion.

[2] Plaintiffs refer to the memo as the "Family Detention Policy" that indefinitely detain[s] any migrant charged with a misdemeanor immigration offense until resolution of that charge." Doc. 11 at 3.

Individuals in DHS custody are subject to immigration proceedings under the Immigration and Nationality Act ("INA") and also may be subject to criminal prosecution, either for criminal immigration violations or for other criminal violations—for example, 8 U.S.C. §§ 1324 (alien smuggling), 1325 (unlawful entry), and 1326 (unlawful entry after removal). These immigration statutes give DHS discretion to refer individuals to DOJ for prosecution based on the particularized facts and circumstances of each individual case.

An increase in unauthorized individuals illegally crossing the Southwest border prompted DOJ on April 6, 2018 to issue a "Memorandum for Federal Prosecutors along the Southwest Border" ("Zero-Tolerance Memo") that provides guidance to those prosecutors on how to exercise their prosecutorial discretion with respect to illegal entry enforcement consistent with DOJ priorities. *See* 2018 WL 1666622, U.S. DOJ, News Release (Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry"). Specifically, it directs Southwest border prosecutors to accept for prosecution, to the extent practicable, all § 1325(a) offenses referred by DHS for prosecution. Whether a person is prosecuted for such crime after a referral by DHS is a decision made by DOJ, and is subject to DOJ's prosecutorial discretion. *See United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.").

At the inception of DOJ's Zero-Tolerance Policy, DHS referred for prosecution adults it had cause to believe unlawfully entered this country on the Southwest border. These adults were transferred to U.S. Marshals Service pretrial custody, and any children traveling with those adults would remain in DHS immigration custody or would be classified as an unaccompanied alien child and transferred to the custody of the Department of Health and Human Services Office of Refugee Resettlement. DHS was not able to swiftly reunite some adults with their children upon completion

of the adult's criminal proceedings. In June 2018, the President addressed this situation and signed an Executive Order which would keep migrant families together during criminal and immigration proceedings to the extent permitted by law, while also maintaining rigorous enforcement of immigration laws. *See* Temporary Family Detention E.O. The Executive Order halted family separation generally and created the "Temporary Detention Policy for Families Entering This Country Illegally." It directed DHS to:

- maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings involving their members";
- called for the Secretary of Defense "to take all legally available measures to provide to DHS any existing facilities available for the housing and care of alien families," and
- and construct such facilities if necessary and consistent with law."

Temporary Family Detention E.O.," 2018 WL 3046068.

## II. Plaintiffs' Lawsuit

Plaintiffs are two community organizations that have longstanding interests in resisting the militarization of the border region and advocating on behalf of immigrant communities in southern New Mexico and far-west Texas. The Border Network for Human Rights ("BNHR") is a self-described advocacy group that organizes marginalized border communities in the region around El Paso, Texas and Las Cruces, New Mexico to defend and promote human and civil rights in the border region. Doc. 10, ¶22. Plaintiff Southwest Environmental Center ("SWEC") is a non-profit conservation organization dedicated to the protection and restoration of native wildlife and their habitats in the Southwest.

In the Amended Motion for Preliminary Injunction (Doc. 11), Plaintiffs urge the Court to invalidate the executive branch's exercise of prosecutorial discretion and enjoin federal prosecutors from enforcing the criminal law and DHS from enforcing the immigration law. They claim that the Zero-Tolerance Policy is causing or will imminently cause, irreparable humanitarian

harm, particularly to families and children who are being detained for extended periods in prison-type environments and in addition, cause irreparable harm to the communities and environment of the Southwest in that it will require Defendants to construct and operate dozens of new detention facilities in this region. Put simply, Plaintiffs urge the Court to enjoin DOJ from prosecuting illegal entry offenses to stop the building of new detention facilities which will house detainees during prosecution of those offenses. Plaintiffs contend that the zero-tolerance policy and the temporary detention policy for family migrants who entered illegally must be set aside because the policies are in fact substantive rules that were issued without offering the public notice of the opportunity to comment on it.

The Amended Complaint contains three claims for relief:

(1) Notice and Comment Violation under the APA, 5 U.S.C. ¶553 regarding Defendants' zero-tolerance policy;

(2) Notice and Comment Violation regarding Defendants' temporary detention policy; and

(3) Violation under the Freedom of Information Act, 5 U.S.C. ¶552(a)(1) ("FOIA")

In this motion, Defendants move to dismiss all of Plaintiffs' claims for lack of standing.

## DISCUSSION

**I.  First and Second "Notice and Comment" Claims—Standing**

Under Article III of the United States Constitution, federal courts are only authorized to hear "cases" and "controversies." U.S. Const. art. III, § 2. The "case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Communications Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). The constitutional minimum of standing contains three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

(1) *Injury-in-Fact:* a plaintiff must have suffered an "injury-in-fact" that is both: (a) "concrete and particularized"; and (b) "actual or imminent, not conjectural or hypothetical." *Lujan,*

504 U.S. at 560. (internal quotation marks omitted). Allegations of possible future injury do not suffice; rather, "[a] threatened injury must be certainly impending to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (quotation omitted). Thus, a plaintiff must allege, "that he has been perceptibly harmed by the challenged action; not that he can imagine circumstances in which he could be affected by agency action." *United States v. SCRAP*, 412 U.S. 669, 688-89 (1973); *Wyoming ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992).

(2) *Causal Connection:* a plaintiff must establish a "causal connection" between the injury and the defendant's acts. *Lujan,* 504 U.S. at 560. The requirement of a causal connection between the defendant's conduct and the plaintiff's injury means that the injury must be "fairly traceable to the challenged action of the defendant," and not the result of the independent actions of a third party. *Lujan*, 504 U.S. at 560 (citation omitted).

(3) *Redressability:* the injury must be "likely to be redressed by a favorable decision." *Lujan,* 504 U.S. at 560; *see also Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976).

A failure to meet any one of these three criteria constitutes a lack of Article III standing and requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See League of United Latin Am. Citizens, N.M. (LULAC) v. Ferrera*, 792 F. Supp. 2d 1222, 1229 (D.N.M. 2011). The party invoking federal jurisdiction has the burden of establishing the elements of standing. *Lujan*, 504 U.S. at 561. These elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Wyoming ex rel. Crank v. United States,* 539 F.3d 1236, 1241 (10th Cir.2008) (citing *Lujan,* 504 U.S. at 561).

In the first and second claims for relief, Plaintiffs allege that Defendants implemented the zero-tolerance policy and the temporary detention policy without first submitting it for public notice and comment under the APA. Plaintiffs challenge the procedures used by Defendants in

implementing the policies, and so these claims are considered allegations of procedural injuries. *See WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1196, 1205 (10th Cir. 2014) (noting that plaintiff's alleged injury—lack of consultation before promulgation of a final environmental plan—was one of process rather than result).[3] The Supreme Court has recognized that, for standing purposes, a party's injury may be a procedural one "so long as the procedures in question are designed to protect some threatened concrete interest of [the party] that is the ultimate basis of [its] standing." *Lujan,* 504 U.S. at 573 n.8. Thus, these claims are alleged as procedural injuries.

For a procedural injury, the requirements for Article III standing are somewhat relaxed, or at least conceptually expanded. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n. 7, (1992). Injury from a properly alleged procedural violation "results not from the agency's decision, but from the agency's uninformed decisionmaking." *Id.* at 1234 (emphasis and internal quotation marks omitted). To establish standing in such circumstances, a plaintiff "need show only that compliance with the procedural requirements *could* have better protected its concrete interests." *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1215–16 (10th Cir. 2017); *WildEarth Guardians v. U.S. E.P.A.*, 759 F.3d 1196, 1205 (10th Cir. 2014) (to establish standing for alleged procedural injury, plaintiff need show "only that compliance with the procedural requirements *could* have better protected its concrete interests") (emphasis added). Similarly, to establish redressability it need show only that the injury—lack of an informed decision—could be redressed by requiring the agency to make a more informed decision. However, Plaintiffs are still required to show a concrete injury or interest on which the procedural injury is based.

---

[3] The Government addresses the "notice and comment" issue as a separate claim on the "merits." *See* Doc. 17 at 18 ("Plaintiffs Fail to State a Claim"). However, the Amended Complaint clearly asserts Defendants' failure to provide an opportunity for public notice as the underlying basis for challenging Defendants' policies.

7

Plaintiffs must also plead the elements of standing in accordance with *Bell Atl. Corp.v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "Threadbare recitals of the elements," which are supported by mere conclusory statements will not suffice at the pleadings stage. *Iqbal*, 559 U.S. at 678. Plaintiff's claims for standing "do not require detailed factual allegations, but must set forth "more than labels and conclusions, and a formulaic recitation of the element of a cause of action will not do." *Twombly*, at 555.

A. <u>Injury-In-Fact</u>

To show they have standing to bring this lawsuit, Plaintiffs must first show that they have suffered an "injury-in-fact" that is both: (a) "concrete and particularized"; and (b) "actual or imminent, not conjectural or hypothetical." *Lujan,* 504 U.S. at 560.

The complaint asserts that the United States Department of Defense ("DOD") was preparing to construct facilities to house up to 20,000 migrant children on four military bases, including Fort Bliss, an army base located in El Paso County, Texas and Doña Ana County, New Mexico, and that Fort Bliss had been selected as one of two sites to house children of adult detainees. Doc. 10, ¶10. Plaintiffs allege that SWEC members and staff "regularly use the myriad federal, state, and local protected lands along the U.S. Mexico border in New Mexico and Texas for hiking, camping, viewing and studying wildlife, photography, hunting, horseback riding, and other scientific, vocational, and recreational activities." Am. Compl. §§ 19, 20. In an appendix to the Amended Motion for Preliminary Injunction (Doc. 11-1), Plaintiffs offer declarations of individuals stating that they use the land for those purposes and stating that construction of a new detention facility or the operation of a "tent city" at Fort Bliss will negatively impact those activities, for example:

- Harm to wildlife habitat and endangered species. Doc. 11-1 at 5, ¶5.

8

- Increased traffic, garbage and disturbance of local environment. Doc. 11-1 at 8, ¶4; at 15, ¶4.

- Increased traffic and air pollution with trucks and buses bringing migrants to and from the detention facility. Doc. 11-1 at 15, ¶4.

- Negative impact to recreational opportunities "by creating air pollution, destroying wildlife habitat, and converting Chihuahuan Desert land into a built environment." Doc. 11-1 at 8, ¶¶3-4.

Plaintiffs also offer statements regarding the alleged lack of public comment as an injury-in-fact:

- Defendants implement "this divisive policy without undertaking notice-and-comment rulemaking." Doc. 11-1 at 9, ¶6.

- Defendants' decisionmaking process "has been completely opaque." Doc. 11-1 at 5, ¶7.

- Not considering public comments - an area of rich diversity, both in its people and in its lands, and these facilities would completely change our way of life. Sadly, our views are not being listened to. Doc. 11-1 at 16, ¶5.

- BNHR and its members would participate in the rulemaking by submitting comments, data, and arguments showing that these policies are immensely harmful to individuals who live in border communities. Doc. 11-1 at 12, ¶8

Some members in Plaintiffs' groups offer comments on Defendants' policies, decrying the separation of families during these border prosecutions. *See, e.g.,* Doc. 11-1 at 9, ¶7, & at 11-12 ("Please reunite the children with their families immediately, as adverse childhood experiences, such as what they are going through, will harm their emotional, social, and educational development critical for their success in life").

Plaintiffs claim they have Article III standing based on three categories of concrete interests that have been adversely affected by the zero tolerance and family detention policies which they allege could have been better protected if Defendants had allowed them to comment on the policies.

### 1. Asylum for Previously Deported Family Members

Plaintiffs claim they have a concrete interest in ensuring that family members who were previously deported are not subject to unlawful restrictions if they subsequently return to the United States to seek asylum. Plaintiffs do not expand on what they mean by "subject to unlawful restrictions," but the Court assumes the phrase refers to Defendants' policies which subject immigrants to the immigration laws of the country, including the screening that is done for asylum applicants.

Plaintiffs rely on *Trump v. Hawaii,* in which the Supreme Court found that a person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury-in-fact. 138 S.Ct. 2392, 2416 (2018). However, the *Trump* case is factually distinguishable and does not provide Plaintiffs with support for claiming an injury-in-fact. In *Trump,* three plaintiffs who were U.S. citizens or lawful permanent residents had relatives from Iran, Syria and Yemen applying for immigrant or nonimmigrant visas. They alleged that the executive proclamation kept these relatives from seeking to enter the country at the time and were therefore affected by the entry of suspension. *Id.* ("The three individual plaintiffs assert another, more concrete injury: the alleged real-world effect that the Proclamation has had in keeping them separated from certain relatives who seek to enter the country").

Plaintiffs in this case do not state a cognizable interest for two reasons. First, the alleged injury is neither concrete nor particularized, nor is there any indication that it is imminent. Threatened injury must be "*certainly impending* to constitute injury in fact and . . . [a]llegations of *possible* future injury are not sufficient." *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015) (emphasis in original). There is not one declaration submitted by a purported *lawful* resident or citizen of the United States asserting that he or she has a family member presently applying for

immigrant visas or seeking asylum in this country; and there is no specificity as to who these "previously deported" individuals might be. 138 S. Ct. at 2416 (citing *Trump v. IRAP,* 582 U.S., at ____, 137 S.Ct., at 2089 (recognizing that an American individual who has "a bona fide relationship with a particular person seeking to enter the country . . . can legitimately claim concrete hardship if that person is excluded")).

Second, Defendants' policies do not necessarily foreclose the granting of asylum. Rather, the expedited removal process as described in the zero-tolerance memo applies only to those who have been found not to have a "credible fear of persecution." *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Thus, Plaintiffs fail to show they will suffer an actual or imminent injury because of these policies.

Third, Plaintiffs have no interest in ensuring that migrants in general are not subject to prosecution if they enter the country illegally. In *Haitian Refugee Ctr. v. Gracey*, plaintiffs claimed they were deprived of an opportunity to associate with some number of a class of unidentified aliens seeking to enter the country. 809 F.2d 794, 800 (D.C. Cir. 1987). The court found this alleged injury to be "no different from that of any American who would enjoy meeting unidentified aliens of a particular nationality denied entry to the United States" and concluded that it was unclear whether such a generalized and unspecific injury was adequate for standing purposes. The court in that case did not decide the injury-in-fact issue because plaintiffs had not satisfied the other two standing requirements of causation and redressability. *Id.*[4] Here, Plaintiffs seek guaranteed asylum to previously deported individuals or other individuals seeking asylum, without scrutiny or screening—which is not a cognizable interest.

---

[4] Plaintiffs claim that the *Haitian Refugee Ctr.* case actually supports Plaintiffs' standing because the plaintiff organization asserted a cognizable injury insofar as an "organizational purpose." 809 F.2d at 799. However, this finding was made in the concurrence, which also agreed with the majority decision that plaintiffs had not established standing.

Therefore, Plaintiffs have not shown they have a concrete interest in ensuring that family members who were previously deported are not subject to unlawful restrictions if they subsequently return to the United States to seek asylum.

        2.        *Reputational Interests*

Plaintiffs state that Plaintiffs have concrete personal, reputational, and dignitary interests that are being harmed by Defendants' policies. Many of Plaintiffs' members are immigrants or the children of immigrants (Plaintiffs do not clarify whether these members are present in the country legally or illegally). Seeing migrant families detained in their own backyard causes these individuals to feel as though they have been stamped with a badge of inferiority, causing them to experience severe emotional distress. *See, e.g.*, Doc. 11-1 at 24, ¶ 13. They also contend that they have been directly impacted by unlawful and discriminatory immigration enforcement practices and that the building of detention facilities at Fort Bliss will create distrust in the community.

Plaintiffs fail to make a showing of an injury-in-fact here as well for two reasons. First, an injury arising from Defendants' allegedly "unlawful" regulation of other individuals is insufficient to establish standing. *Lujan,* 504 U.S. at 562. Here, Plaintiffs trace their "badge of inferiority" to the federal government's prosecution of *others* for crimes these *others* have committed. *See e.g.*, Doc. 11-1 at 11,¶5 (Plaintiffs who are immigrants or the children of immigrants feel "stamped . . . with a badge of inferiority, and/or feeling of criminality . . . [s]eeing migrant families and children detained in their own backyard."). Plaintiffs' assertion of injury arising from the government's "allegedly unlawful regulation . . . of *someone else*" is not enough to establish standing. *Lujan,* 504 U.S. at 562; *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (in order to establish

12

standing, an organization must "submit affidavits . . . showing, through specific facts . . . that one or more of [its] members would . . . be directly affected by the allegedly illegal activity").[5]

Second, feelings of shame or inferiority do not constitute concrete harms. Stigmatization may constitute an injury in fact for standing purposes, but it must be accompanied by concrete injuries. *Heckler v. Mathews,* 465 U.S. 728, 739–40 (1984) (cited in *Parsons,* 801 F.3d at 712); *see also Humane Soc'y of U.S. v. Babbitt,* 46 F.3d 93, 98 (D.C.Cir.1995) (explaining that "general emotional 'harm,' no matter how deeply felt, cannot suffice for injury-in-fact for standing purposes"); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 25 (D.D.C. 2010) (emotional harm—in and of itself—is not sufficient to satisfy Article III's injury in fact requirement). Plaintiffs rely on *Parsons v. U.S. Dep't of Justice*, where fans of the Insane Clown Posse musical group challenged the procedure by which the National Gang Intelligence Center listed them as a gang. 801 F.3d 701, 712 (6th Cir. 2015). The court found that plaintiffs had sufficiently alleged a First Amendment injury-in-fact based on reputational injury. Reputational injury must be accompanied by *concrete harm* in order to establish an injury in fact. *Meese v. Keene,* 481 U.S. 465, 473–76 (1987), cited in *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 711 (6th Cir. 2015); *see, e.g., Paul v. Davis,* 424 U.S. 693, 710 (1976) (where reputational injury is accompanied by concrete harm, such as termination of employment, cognizable claim under Due Process Clause exists).

The *Parsons* case does not help Plaintiffs. The plaintiffs in that case alleged concrete reputational injuries resulting in allegedly improper stops, detentions, interrogations, searches, denial of employment, and interference with contractual relations. 801 F.3d at 712. Plaintiffs show no injury-in-fact that is both concrete and particularized; rather, they allege only general

---

[5] The Court would not be surprised if similar feelings of inferiority and shame are experienced by family members of United States citizens who have been arrested or sent to prison. However, these feelings of being stigmatized alone do not give these individuals standing to challenge the federal government's enforcement of this country's criminal laws.

13

feelings of embarrassment and "unlawful and discriminatory immigration enforcement practice" as a result of being associated with the illegal immigrants being processed. Such allegations are insufficient to constitute a concrete harm.

Also, despite contentions of unlawful discriminatory immigration practices having occurred, not one member of either Plaintiffs' groups has submitted an affidavit, statement or declaration asserting that he or she was subjected to these practices. In *Meese v. Keene,* for example, the Supreme Court noted that plaintiff would not have had standing had he merely alleged a chilling effect, but by introducing affidavits stating that his reputation would suffer reputation if he showed films designated by the government as "political propaganda," plaintiff "cleared the injury in fact hurdle." 481 U.S. 465, 473–76 (1987) (noting that plaintiff would not have had standing had he merely alleged a chilling effect, but by introducing affidavits stating that his reputation would suffer reputation would suffer if he showed films designated by the government as "political propaganda," plaintiff "cleared the injury in fact hurdle).[6]

Therefore, Plaintiffs have not sufficiently satisfied Article III's injury-in-fact requirement related to personal, reputational and dignitary interests.

### 3. Recreational and Aesthetic Interest

Finally, Plaintiffs claim they have concrete aesthetic, recreational, and health interests that are being, or will imminently be, harmed by Defendants' policies because many of Plaintiffs' members live, work, and recreate near Fort Bliss, where new detention facilities are being constructed to house up to 12,000 children and families.[7] They contend that the temporary

---

[6] In this case, however, submission of additional affidavits would not resolve the standing issue for these plaintiffs. First, alleging unlawful discriminatory practices does not mean that unlawful discrimination actually occurred; and second, as the Court has just explained, feeling shamed or stigmatized because other illegal aliens are being prosecuted for committing immigration crimes is simply not a basis for standing.

[7] The Court assumes that Plaintiffs challenge only Defendants' family detention policy rather than the zero-tolerance policy since the prosecution of immigration would appear to have no relation to an alleged aesthetic or

14

detention of "migrant families" amounts to a cognizable injury because it will cause a negative environmental impact.

Plaintiffs fail to show injury-in-fact on two grounds. First, Plaintiffs claim that all sorts of harm will result from building the detention structures: air pollution, destruction of scenic vistas, destruction of wildlife and their habitat, increased traffic, increased noise and increased garbage. The submitted declarations, however, are premised on sheer speculation. Plaintiffs make conclusory statements about what they expect will happen when the facilities are built and provide absolutely no basis at all to support a finding that any of these alleged negative effects are either actual or imminent. *See U.S. v. SCRAP,* 412 U.S. 669, 688-89 (1973) (a plaintiff must allege, "that he has been perceptibly harmed by the challenged action; not that he can imagine circumstances in which he could be affected by agency action"); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (allegations of possible future injury do not suffice; rather, "[a] threatened injury must be certainly impending to constitute injury in fact"); *see also Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F. Supp. 2d 1118, 1128 (D.N.M. 2011) (no standing where plaintiffs' allegations were conjectural and hypothetical and where plaintiffs offered only inadmissible non-expert opinions as a basis for their standing in case).

Plaintiffs fail to show injury-in-fact for another reason: they fail to show that their interests will be affected by use of the area designated for construction of the detention facilities. According to the complaint, detention facilities are being built on the Fort Bliss military base. Doc. 10, ¶10. Plaintiffs claim that they hike, camp, study wildlife and birdwatch in the area, but it is not clear at all that they enjoy these activities in the particular areas where the facilities will be constructed. Plaintiffs also allege that other detention facilities may be built along the Doña Aña Range

---

recreational injury. However, the Court's analysis would be the same even if both policies were being challenged in this category.

Complex, "on information and belief. . . ." Doc. 10, ¶11. Again, the declarations provided do not provide a sufficient basis to find standing based on Plaintiffs' actual use of the area affected by the challenged activity:

- SWEC's members and staff regularly use the myriad federal, state, and local protected lands along the U.S.-Mexico border in New Mexico and Texas for hiking, camping, viewing and studying wildlife, photography, hunting, horseback riding . . . . Doc. 11-1 at 4, ¶4.

- Any construction activity adjacent to this protected land [the Doña Aña Range Complex] could cause significant harm to SWEC users who recreate on the monument—for example, by causing dust and other air pollution, destruction of scenic vistas, destruction of wildlife and their habitat, increased traffic, and increased garbage. Doc. 11-1 at 5, ¶7.

To establish standing, Plaintiffs must show that they "use the area affected by the challenged activity and not an area roughly in the vicinity of'" the activity. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 566 (1992)). Moreover, expected use or intended use by others is not enough to confer standing. *Cmp. New Mexico Off-Highway Vehicle All. v. U.S. Forest Serv.*, 645 F. App'x 795, 802 (10th Cir. 2016) (no standing where plaintiff did not state "that he has used, or intends to use, any particular route affected by the designation process"). None of the submitted declarations indicates actual use of the specific area on which the detention facilities will be built, and so Plaintiffs have not established that they have suffered (or will imminently suffer) a cognizable recreational or aesthetic injury.

   *4.      Family Separation*

Another issue reoccurs in the declarations related to family separation although it is not raised as a separate injury: Defendants' policies result in the separation of immigrant families.

The Court assumes that in raising this issue, Plaintiffs are referring to the zero-tolerance policy rather than the family detention policy, since the purpose behind building temporary

detention facilities is to keep families *together* during criminal and immigration proceedings. However, Plaintiffs have no cognizable interest in foreclosing the prosecution of immigration crimes simply because such prosecution may result in the separation of family members. To the extent that family members are separated, that is a consequence resulting from the commission of a crime rather than from Defendants' policies. More importantly, for purposes of a standing analysis, Plaintiffs cannot show that they have suffered a legally cognizable injury-in-fact based on the separation of *other* families. *See Summers,* 555 U.S. at 498 (in order to establish standing, an organization must "submit affidavits . . . showing, through specific facts . . . that one or more of [its] members would . . . be directly affected by the allegedly illegal activity"); *see also U.S. v. Richardson*, 418 U.S. 166, 171 (1974) (plaintiff must be able to show that he is "immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally").

Because Plaintiffs have not shown that they suffered an "injury-in-fact," there is no need to address whether the injury was caused by Defendants' acts or whether it is redressable. *See League of United Latin Am. Citizens,* 792 F.Supp.2d at 1229 (failure to meet any one of the three criteria for Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)).

Plaintiffs' first and second claims in the Amended Complaint are therefore dismissed with prejudice for lack of standing.

## II. Third Claim Under FOIA

Plaintiffs claim that the family detention policy violates the Freedom of Information Act ("FOIA") because it was not published in the Federal Register. Doc. 10 at ¶¶ 48-50. Relevant

language under FOIA states that each agency shall state and currently publish in the Federal Register "for the guidance of the public":

> . . . substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; . . .

5 U.S.C.A. § 552 (West) (a)(1)(D). Under §552(a)(4)(B), federal district courts are authorized to enjoin an agency from withholding agency records and to order the production of any agency records improperly withheld . . . ." 5 U.S.C. § 552(a)(4)(B). This provision governs judicial review of information under § 552(a)(1*). Citizens for Responsibility & Ethics v. U.S. Dep't of Justice*, 846 F.3d 1235, 1240–41 (D.C. Cir. 2017).

Parties establish standing under FOIA by showing that "they sought and were denied specific agency records." *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 449-50 (1989) (Parties establish standing under FOIA by showing that "they sought and were denied specific agency records"). Also, Plaintiffs asserting a FOIA violation are not exempt from having to satisfy the usual constitutional standing requirements: (1) an invasion of a legally protected interest,—which is concrete and particularized and is actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) likeliness that the injury will be redressed by a favorable decision." *Tipograph v. Dep't of Justice*, 146 F. Supp. 3d 169, 175 (D.D.C. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. at 560)).

Federal jurisdiction under FOIA is dependent upon a showing that an agency has (1) "improperly" (2) "withheld" (3) "agency." *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 137–38 (1980). According to the complaint, Defendants have repeatedly "denied that the family detention policy exists, or sought to evade responsibility for it by falsely claiming that it is mandated by existing law." Doc. 10, ¶47. However, as Defendants note,

Plaintiffs do not allege that they have filed a FOIA request, which would trigger the requirements of the FOIA statute. Plaintiffs do not have an outstanding FOIA request, and no documents have therefore been withheld in violation of FOIA and therefore they do not satisfy Article III's standing requirements to assert a FOIA claim. *See, e.g., Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 133 (D.D.C. 2018) (plaintiffs alleged sufficiently concrete and impending injury with the submission of declarations attesting to the organization's plans to file future FOIA requests and unavailability of records that would have been responsive to those requests).[8]

Plaintiffs have not shown the requisite standing to bring a FOIA claim, and so that claim is dismissed as well.

## CONCLUSION

The Court finds and concludes that because Plaintiffs lack standing to pursue any of the three claims alleged in the Amended Complaint, all three claims are hereby DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

_____
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[8] *See also Public Citizen v. Department of Justice*, 491 U.S. 440, 449 (1989) (failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue") (emphasis added), cited in *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998). It stands to reason that information cannot be "obtained" unless it is first requested—which means that a FOIA request (or something formally akin to it) is required in order to allege a FOIA claim. Plaintiffs cite to *Preminger v. Sec'y of Veterans Affairs* to support its position that it has standing to pursue the FOIA claim. 632 F.3d 1345, 1348 (Fed. Cir. 2011). However, the plaintiff in *Preminger* had actually made a request to the Secretary of Veterans Affairs ("VA") to initiate a rulemaking in order to define how veterans who reside on VA campuses will receive assistance in registering and voting. Plaintiffs in this case have not alleged they have gone to the extent of making a request under FOIA.